# 16-1189-cv

## United States Court of Appeals
### *for the*
## Second Circuit

CHARLES SCHWAB CORPORATION, CHARLES SCHWAB BANK, N.A.,
CHARLES SCHWAB & CO., INC., SCHWAB SHORT-TERM BOND
MARKET FUND, SCHWAB TOTAL BOND MARKET FUND, SCHWAB U.S.
DOLLAR LIQUID ASSETS FUND, SCHWAB MONEY MARKET FUND,
SCHWAB VALUE ADVANTAGE MONEY FUND, SCHWAB RETIREMENT
ADVANTAGE MONEY FUND, SCHWAB INVESTOR MONEY FUND,
SCHWAB CASH RESERVES, SCHWAB ADVISOR CASH RESERVES,
SCHWAB YIELDPLUS FUND, SCHWAB YIELDPLUS FUND
LIQUIDATION TRUST,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

STEVEN E. FINEMAN
MICHAEL J. MIARMI
LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

THOMAS C. GOLDSTEIN
ERIC F. CITRON
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
(202) 362-0636

RICHARD M. HEIMANN
BRENDAN P. GLACKIN
LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-1000

*Attorneys for Plaintiffs-Appellants*

FTC CAPITAL GMBH, FTC FUTURES FUND PCC LTD, FTC FUTURES
FUND SICAV, CARPENTERS PENSION FUND OF WEST VIRGINIA, CITY
OF DANIA BEACH POLICE & FIREFIGHTERS' RETIREMENT SYSTEM,
RAVAN INVESTMENTS, LLC, MAYOR AND CITY COUNCIL OF
BALTIMORE, RICHARD HERSHEY, JEFFREY LAYDON, METZLER
INVESTMENT GᴍʙH, ROBERTO CALLE GRACEY, CITY OF NEW
BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, AVP
PROPERTIES, LLC, 303030 TRADING LLC, ELLEN GELBOIM, ATLANTIC
TRADING USA, LLC, COMMUNITY BANK & TRUST, THE BERKSHIRE
BANK, ELIZABETH LIEBERMAN, 33-35 GREEN POND ROAD
ASSOCIATES, LLC, TODD AUGENBAUM, GARY FRANCIS, NATHANIEL
HAYNES, COURTYARD AT AMWELL II, LLC, GREENWICH COMMONS
II, LLC, JILL COURT ASSOCIATES II, LLC, MAIDENCREEK VENTURES II
LP, RARITAN COMMONS, LLC, LAWRENCE W. GARDNER, ANNIE BELL
ADAMS, DENNIS PAUL FOBES, LEIGH E. FOBES, GOVERNMENT
DEVELOPMENT BANK FOR PUERTO RICO, MARGARET LAMBERT,
DIRECORS FINANCIAL GROUP, BETTY L. GUNTER, DIRECT ACTION
PLAINTIFFS, CARL A. PAYNE, KENNETH W. COKER, CITY OF
RIVERSIDE, THE RIVERSIDE PUBLIC FINANCING AUTHORITY, EAST
BAY MUNICIPAL UTILITY DISTRICT, COUNTY OF SAN MATEO, SAN
MATEO COUTY JOINT POWERS FINANCING AUTHORITY, CITY OF
RICHMOND, THE RICHMOND JOINT POWERS FINANCING AUTHORITY,
Successor Agency to the Richmond Community Redevelopment Agency,
COUNTY OF SAN DIEGO, GUARANTY BANK & TRUST COMPANY,
HEATHER M. EARLE, HENRYK MALINOWSKI, LINDA CARR, ERIC
FRIEDMAN, COUNTY OF RIVERSIDE, JERRY WEGLARZ, NATHAN
WEGLARZ, SEIU PENSION PLANS MASTER TRUST, HIGHLANDER
REALTY, LLC, JEFFREY D. BUCKLEY, THE FEDERAL HOME LOAN
MORTGAGE CORPORATION, COUNTY OF SONOMA, DAVID E.
SUNDSTROM, in his official capacity as Treasurer of the County of Sonoma for
and on behalf of the Sonoma County Tresury Pool Investment, THE REGENTS
OF THE UNIVERSITY OF CALIFORNIA, SAN DIEGO ASSOCIATION OF
GOVERNMENTS, CEMA JOINT VENTURE, COUNTY OF SACRAMENTO,
THE CITY OF PHILADELPHIA, THE PENNSYLVANIA
INTERGOVERNMENTAL COOPERATION AUTHORITY, PRINCIPAL
FUNDS, INC., PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND
MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI
DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI
GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH
QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND
I, PFI INCOME FUND, PFI INFLATION PROTECTION FUND, PFI SHORT-
TERM INCOME FUND, PFI MONEY MARKET FUND, PFI PREFERRED
SECURITIES FUND, PRINCIPAL VARIABLE CONTRACTS FUNDS, INC.,
PVC ASSET ALLOCATION ACCOUNT, PVC MONEY MARKET
ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE
SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC
GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME
ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL
FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC.,

PRINCIPAL LIFE INSURANCE COMPANY, PRINCIPAL CAPITAL
INTEREST ONLY I, LLC, PRINCIPAL COMMERCIAL FUNDING, LLC,
PRINCIPAL COMMERCIAL FUNDING II, LLC, PRINCIPAL REAL ESTATE
INVESTORS, LLC, TEXAS COMPETITIVE ELECTRIC HOLDINGS
COMPANY LLC, NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal Credit Union, WESTERN
CORPORATE FEDERAL CREDIT UNION, MEMBERS UNITED
CORPORATE FEDERAL CREDIT UNION, SOUTHWEST CORPORATE
FEDERAL CREDIT UNION, and CONSTITUTION CORPORATE FEDERAL
CREDIT UNION, FEDERAL NATIONAL MORTGAGE ASSOCIATION,
DARBY FINANCIAL PRODUCTS, CAPITAL VENTURES
INTERNATIONAL, BAY AREA TOLL AUTHORITY, PRUDENTIAL
INVESTMENT PORTFOLIOS 2, on behalf of Prodential Core Short-Term Bond
Fund, PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, TRIAXX
PRIME CDO 2006-1, LTD., TRIAXX PRIME CDO 2006-2, LTD., TRIAXX
PRIME CDO 2007-1, LTD., THE FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver, DIRECT ACTION PLAINTIFF, DIRECT
ACTION PLAINTIFFS, SALIX CAPITAL US INC., FRAN P. GOLDSLEGER,
JOSEPH AMABILE, LOUIE AMABILE, NORMAN BYSTER, MICHAEL
CAHILL, RICHARD DEOGRACIAS, MARC FEDERIGHI, SCOTT
FEDERIGHI, ROBERT FURLONG, DAVID GOUGH, BRIAN HAGGERTY,
DAVID KLUSENDORF, RONALD KRUG, CHRISTOPHER LANG, JOHN
MONCKTON, PHILIP OLSON, BRETT PANKAU, DAVID VECCHIONE,
RANDALL WILLIAMS, EDUARDO RESTANI, NICHOLAS PESA, JOHN
HENDERSON, 303 PROPRIETARY TRADING LLC, MARGERY TELLER,
CALIFORNIA PUBLIC PLAINTIFFS, NATIONAL ASBESTOS WORKERS
PENSION FUND, PENSION TRUST FOR OPERATING ENGINEERS,
HAWAII ANNUITY TRUST FUND FOR OPERATING ENGINEERS,
CEMENT MASONS' INTERNATIONAL ASSOCIATION EMPLOYEES'
TRUST FUND, AXIOM INVESTMENT ADVISORS, LLC, AXIOM HFT LLC,
AXIOM INVESTMENT ADVISORS HOLDINGS L.P., AXIOM
INVESTMENT COMPANY, LLC, AXION INVESTMENT COMPANY
HOLDINGS L.P., AXIOM FX INVESTMENT FUND, L.P., AXIOM FX
INVESTMENT FUND II, L.P., AXIOM FX INVESTMENT 2X FUND, L.P.,
EPHRAIM F. GILDOR, GILDOR FAMILY ADVISORS L.P., GILDOR
FAMILY COMPANY L.P., GILDOR MANAGEMENT, LLC, CITY OF
PHILADELPHIA, PENNSYLVANIA INTERGOVERNMENTAL
COOPERATION AUTHORITY, CITY OF NEW BRITAIN, LINDA ZACHER,

*Plaintiffs,*

— v. —

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BANK
OF TOKYO-MITSUBISHI UFJ, LTD., BARCLAYS BANK PLC, CITIGROUP
INC., CITIBANK, N.A., COOPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., CREDIT SUISSE GROUP AG, DEUTSCHE
BANK AG, HSBC HOLDINGS PLC, HSBC BANK PLC, JPMORGAN CHASE
& CO., JPMORGAN CHASE BANK, N.A., LLOYDS BANKING GROUP PLC,
HBOS PLC, ROYAL BANK OF CANADA, THE NORINCHUKIN BANK,
THE ROYAL BANK OF SCOTLAND GROUP PLC, UBS AG, PORTIGON
AG, fka WestLB AG, WESTDEUTSCHE IMMOBILIENBANK AG,

*Defendants-Appellees,*

RABOBANK GROUP, CREDIT SUISSE GROUP, NA, SOCIETE GENERALE, DEUTSCHE BANK FINANCIAL LLC, DEUTSCHE BANK SECURITIES INCORPORATED, BARCLAYS CAPITAL INC., BARCLAYS U.S. FUNDING LLC, CREDIT SUISSE SECURITIES (USA) LLC, BANK OF AMERICA SECURITIES LLC, J.P. MORGAN CLEARING CORP., HSBC SECURITIES (USA) INC., UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., NATIONAL ASSOCIATION, BANK OF NOVA SCOTIA, BNP PARIBAS S.A., CREDIT ARGICOLE, S.A., SUMITOMO MITSUI BANKING CORPORATION, BARCLAYS PLC, WESTLB AG, CHASE BANK USA, N.A., ROYAL BANK OF SCOTLAND, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, CITIZENS BANK OF MASSACHUSETTS, Agent of RBS Citizens Bank, NA, RBS CITIZENS, N.A., (f/k/a Citizens Bank of Massachusetts) incorrectly sued as othe Charter One Bank NA, STEPHANIE NAGEL, BRITISH BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD, BBA LIBOR, LTD, CREDIT SUISSE INTERNATIONAL, HSBC BANK USA, N.A., LLOYDS TSB BANK PLC, J.P. MORGAN BANK DUBLIN PLC, formerly known as Bear Stearns Bank PLC, UBS LIMITED, CITIGROUP FINANCIAL PRODUCTS, INC., ICAP PLC, CREDIT SUISSE AG, CREDIT SUISSE (USA), INC., THE HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., J.P. MORGAN MARKETS LTD., LLOYDS BANK PLC, (formerly known as Lloyds TSB Bank PLC), RBC CAPITAL MARKETS, LLC, BANK OF AMERICA HOME LOANS, CITI SWAPCO INC., J.P. MORGAN SECURITIES, LLC, MERRILL LYNCH CAPITAL SERVICES, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, RBS SECURITIES INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP FUNDING, INC., HSBC FINANCE CORPORATION, HSBC USA, INC., MERRILL LYNCH & CO., INC., MERRILL LYNCH INTERNATIONAL BANK, LTD., BEAR STEARNS CAPITAL MARKETS, INC., CITIZENS BANK N.A., CREDIT SUISSE SECURITIES (USA) INC., BARCLAYS CAPITAL (CAYMAN) LIMITED, SOCIETE GENERALE, S.A.,

*Defendants.*

## PARTIES AND CORPORATE DISCLOSURE STATEMENT

For brevity, unless otherwise necessary, this brief refers to the plaintiff-appellants collectively as the "Schwab plaintiffs" or "Schwab." The Schwab plaintiffs consist of (1) Charles Schwab Bank, N.A.; (2) Charles Schwab & Co., Inc.; (3) The Charles Schwab Corporation; (4) the "Schwab Money Funds" (consisting of Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Schwab YieldPlus Fund, and Schwab YieldPlus Fund Liquidation Trust); and (5) the "Schwab Bond Funds" (consisting of Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, and Schwab U.S. Dollar Liquid Assets Fund).

The Charles Schwab Corporation is a publicly traded company, and is the parent company of Charles Schwab Investment Management Inc.; Charles Schwab Bank, N.A.; and Schwab Holdings, Inc. Schwab Holdings, Inc. is the parent company of Charles Schwab & Co., Inc. No publicly traded company owns 10% of the Charles Schwab Corporation or any other appellant. Both the Schwab Money Funds and the Schwab Bond Funds are independently managed funds advised by Charles Schwab Investment Management Inc. None has a parent corporation, and no publicly held company owns 10% or more of any of these appellants.

The defendant-appellees, referred to collectively as "defendants" or "the banks," consist of (1) Bank of America Corporation; (2) Bank of America, N.A.; (3) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (4) Barclays Bank PLC; (5) Citigroup Inc.; (6) Citibank, N.A.; (7) Coöperatieve Centrale Raiffeisen Boerenleenbank B.A. (n/k/a Coöperatieve Rabobank U.A.) ("Rabobank"); (8) Credit Suisse Group AG; (9) Deutsche Bank AG; (10) HSBC Holdings plc; (11) HSBC Bank plc; (12) JPMorgan Chase & Co.; (13) JPMorgan Chase Bank, N.A.; (14) Lloyds Banking Group plc; (15) HBOS plc; (16) The Norinchukin Bank; (17) Portigon AG (f/k/a WestLB AG); (18) Royal Bank of Canada; (19) The Royal Bank of Scotland Group plc ("RBS"); (20) UBS AG; and (21) Westdeutsche ImmobilienBank AG.

# TABLE OF CONTENTS

**Page**

PARTIES AND CORPORATE DISCLOSURE STATEMENT ............................ i

TABLE OF CONTENTS ........................................................ iii

TABLE OF AUTHORITIES ...................................................... v

PRELIMINARY STATEMENT ................................................... 1

JURISDICTION ................................................................ 3

ISSUES PRESENTED ........................................................... 3

STATEMENT OF THE CASE ................................................... 4

    I.    Factual Background .................................................. 4

    II.    Procedural History ................................................. 12

SUMMARY OF ARGUMENT ................................................. 17

STANDARD OF REVIEW .................................................... 22

ARGUMENT ................................................................ 23

    I.    The District Court Erred In Holding That California Courts Lacked Personal Jurisdiction Over Defendants. ................................ 23

        A.    The California courts clearly have specific personal jurisdiction over the selling defendants. ...................................... 23

        B.    Personal jurisdiction lies over the non-selling defendants under the conspiracy rule or the effects test. ............................ 33

        C.    Personal jurisdiction also lies over Schwab's state-law claims by virtue of Schwab's Exchange Act claims. ..................... 38

        D.    In any event, defendants forfeited any challenge to personal jurisdiction. ................................................... 40

    II.    The District Court Repeatedly Erred In Dismissing Claims By Resolving Contested Factual Disputes In Defendants' Favor ............ 41

        A.    The district court erred in dismissing Schwab's fraud claims arising from fixed-rate transactions. ............................. 42

        B.    The district court erred in dismissing Schwab's Exchange Act claims. ..................................................... 44

C.     The district court erred in partially dismissing Schwab's unjust enrichment claims as untimely. ........................................................50

D.     The district court erred in holding that Schwab failed to state a civil conspiracy theory of relief under California law.......................59

CONCLUSION ....................................................................................................60

CERTIFICATE OF COMPLIANCE ....................................................................62

# TABLE OF AUTHORITIES

**Page**

## Cases

*Acticon AG v. China Ne. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ............................................................. 49, 50

*Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*,
  115 F. App'x 662 (5th Cir. 2004) .........................................................34

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ..................................................... 23, 42, 45

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
  869 P.2d 454 (Cal. 1994) ......................................................... 14, 59

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d Cir. 2002) ..................................................... 26, 31

*BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*,
  2013 WL 6003701 (S.D.N.Y. Nov. 13, 2013).......................................58

*BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*,
  603 F. App'x 57 (2d Cir. 2015) .........................................................51

*Bristol-Myers Squibb Co. v. Superior Court*,
  206 Cal. 3d 636 (2016) .....................................................................24

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)............................................................ 28, 32, 37

*Calder v. Jones*,
  465 U.S. 783 (1984)........................................................ 27, 30, 37, 38

*Chew v. Dietrich*,
  143 F.3d 24 (2d Cir. 1998) ....................................................... 24, 32, 39

*Chloé v. Queen Bee of Beverly Hills*,
  616 F.3d 158 (2d Cir. 2010) ........................................................ 26, 31

*Chrysler Capital Corp. v. Century Power Corp.*,
  778 F. Supp. 1260 (S.D.N.Y. 1991) .................................................34

*City of New York v. Mickalis Pawn Shop*,
  645 F.3d 114 (2d Cir. 2011) ...........................................................40

*Eades v. Kennedy, PC Law Offices*,
  799 F.3d 161 (2d Cir. 2015) ........................................................ 28, 34

*Engalla v. Permanente Med. Grp., Inc.*,
  938 P.2d 903 (Cal. 1997) ...............................................................43

*Fox v. Ethicon Endo-Surgery, Inc.*,
 110 P.3d 914 (Cal. 2005) ............................................................ 50, 52

*Freudenberg v. E\*Trade Fin. Corp.*,
 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................50

*Gelboim v. Bank of America*,
 823 F.3d 759 (2d Cir. 2016) ...................................................... passim

*Gucci Am., Inc. v. Li*,
 768 F.3d 122 (2d Cir. 2014) .............................................................41

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 134 S. Ct. 2398 (2014)....................................................................45

*Hamilton v. Atlas Turner, Inc.*,
 197 F.3d 58 (2d Cir 1999) ................................................................40

*Hargrave v. Oki Nursery, Inc.*,
 646 F.2d 716 (2d Cir. 1980) ..............................................................40

*In re Agent Orange Prod. Liab. Litig.*,
 818 F.2d 145 (2d Cir. 1987) ..............................................................24

*In re Ambac Fin. Grp., Inc., Sec. Litig.*,
 693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...................................................57

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016)....................................28

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016)....................................49

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................ passim

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
 2011 WL 1842819 (N.D. Cal. May 16, 2011)....................................56

*In re Terrorist Attacks on Sept. 11, 2001*,
 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................34

*In re Terrorist Attacks on Sept. 11, 2001*,
 714 F.3d 659 (2d Cir. 2013). ...........................................................23

*Int'l Union of Operating Eng'rs v. Bank of N.Y. Mellon Corp.*,
 2012 WL476526 (N.D. Cal. Feb. 14, 2012) ......................................56

*Irving v. Lennar Corp.*,
 2014 WL 68691 (E.D. Cal. Jan. 8, 2014) ..........................................52

*IUE AFL-CIO Pension Fund v. Herrmann*,
 9 F.3d 1049  (2d Cir. 1993) .............................................................40

*Johnson v. Holder*,
  564 F.3d 95 (2d Cir. 2009) ................................................................48

*Jolly v. Eli Lilly & Co.*,
  751 P.2d 923 (Cal. 1988) ...................................................................52

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) ...........................................................................28

*LC Capital Partners v. Frontier Ins. Grp, Inc.*,
  318 F.3d 148 (2d Cir. 2003) ......................................................... 56, 57

*Leasco Data Processing Equip. Corp. v. Maxwell*,
  468 F.2d 1326 (2d Cir. 1972) ............................................................35

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ......................................................... 22, 26

*Mariash v. Morrill*,
  496 F.2d 1138 (2d Cir. 1974) ............................................................39

*Melea Ltd. v. Jawer SA*,
  511 F.3d 1060 (10th Cir. 2007) .........................................................34

*Menowitz v. Brown*,
  991 F.2d 3 (2d Cir. 1993 ...............................................................1, 25

*Moon Joo Yu v. Premiere Power LLC*,
  2015 WL 4629495 (S.D.N.Y. Aug. 4, 2015) ....................................39

*Pinkerton v. United States*,
  328 U.S. 640 (1946) ...........................................................................36

*Pooshs v. Philip Morris USA, Inc.*,
  250 P.3d 181 (Cal. 2011) ...................................................................52

*S. N. Eng. Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) ..............................................................22

*Sea Trade Mar. Corp. v. Coutsodontis*, 2012 WL 3594288
  (S.D.N.Y. Aug. 16, 2012) ..................................................................34

*SEC v. Monarch Funding Corp.*,
  192 F.3d 295 (2d Cir. 1999) ..............................................................47

*SEC v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990) ............................................................39

*Second Amendment Found. v. U.S. Conference of Mayors*,
  274 F.3d 521 (D.C. Cir. 2001) ..........................................................34

*Simon v. Safelite Glass Corp.*,
  128 F.3d 68 (2d Cir. 1997) ................................................................48

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,

vii

547 F.3d 406 (2d Cir. 2008) ...............................................................50

*Stauffacher v. Bennett*,
   969 F.2d 455 (7th Cir. 1992) ................................................ 34, 36

*Textor v. Bd. of Regents of N. Ill. Univ.*,
   711 F.2d 1387 (7th Cir. 1983) ......................................................33

*Unruh-Haxton v. Regents of the Univ. of Cal.*,
   76 Cal. Rptr. 3d 146 (Cal. Ct. App. 2008).....................................55

*Unspam Techns., Inc. v. Chernuk*,
   716 F.3d 322 (4th Cir. 2013) .......................................................34

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014)................................................ 19, 25, 27, 36

*Waldman v. Palestine Liberation Org.*,
   --- F.3d ---, 2016 WL 4537369 (2d Cir. Aug. 31, 2016)...............38

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286  (1980)........................................................ 29, 30, 38

## Statutes

12 U.S.C. §632....................................................................................3
15 U.S.C. §78aa ..................................................................................3
18 U.S.C. §1964 ........................................................................... 13, 47
28 U.S.C. §1330..................................................................................3
28 U.S.C. §1291..................................................................................3
28 U.S.C. §1331..................................................................................3
28 U.S.C. §1367..................................................................................3
28 U.S.C. §1441..................................................................................3
28 U.S.C. §1603..................................................................................3

## Other Authorities

Restatement (Second) of Torts §534...................................................44
Samuel Cheun & Matt Raskin, Markets Grp., Fed. Res. Bank of N.Y.,
   *Recent Concerns Regarding LIBOR's Credibility* (May 20, 2008) ....................54

## PRELIMINARY STATEMENT

This case concerns defendants' long-running and far-reaching conspiracy to manipulate LIBOR, which their own trade association called "the world's most important number." A768 (¶7). This Court has already held that plaintiffs plausibly alleged that conspiracy, negating a core aspect of the decision on review here, while noting that the question was not particularly close. *Compare* SPA107-21 (holding conspiracy not plausibly alleged), *with Gelboim v. Bank of America*, 823 F.3d 759, 781-82 (2d Cir. 2016) ("Close cases abound on this issue, but this is not one of them."). This appeal concerns several additional rulings, from the very same opinion, where the district court (Buchwald, J.) likewise ignored the plaintiffs' specific allegations and resolved factual disputes before even allowing discovery.

Most critically, the district court clearly erred in holding that Schwab could not sue a single defendant in California. That was so, the court reasoned, because Schwab's claims arose from purely "fortuitous" or "plaintiff-driven" contacts between the defendants and that State. SPA77.[1] That cannot be right. Schwab is a massive institutional investor that bought *hundreds of billions* of dollars in LIBOR-

---

[1] As Schwab's case was initiated in California state court before being removed to federal court and transferred to the Southern District of New York under 28 U.S.C. §1407, the jurisdictional analysis turns on whether a California court could properly exercise jurisdiction over defendants. *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (per curiam).

1

based instruments during the relevant time. And, among other things, Schwab alleged that defendants all participated in a conspiracy in which certain defendant banks directly solicited Schwab *in California* for the purchase of LIBOR-based instruments, disseminated fraudulent offering materials for LIBOR-based debts they issued to Schwab *in California*, and *actually sold* those products to Schwab *in California*. *See, e.g.*, A767, 773-81, 866-75 (¶¶5, 9-13, 21, 25-53, 268-300). If those contacts do not establish a *prima facie* case for specific personal jurisdiction over the defendants in a suit by Schwab in California, nothing does.

Schwab challenges several other rulings as well, including the dismissal of its state-law fraud claims respecting fixed-rate instruments, the dismissal of its claims under the Securities Exchange Act of 1934 ("Exchange Act"), the dismissal of certain unjust-enrichment claims on timeliness grounds, and the dismissal of its conspiracy allegations—a lynchpin holding this Court has already nullified. But while those infirmities are detailed below, they are at bottom variations on the same theme: Simply put, the district court repeatedly arrived at untenable results by overlooking or misconstruing Schwab's specific allegations and, in several instances, resolving factual disputes in defendants' favor. As with the conspiracy allegations addressed in *Gelboim*, Schwab's detailed allegations on its state-law claims require factual development in discovery, not pleading-stage dismissal. This Court should reverse.

## JURISDICTION

District-court jurisdiction arose under 15 U.S.C. §78aa and 28 U.S.C. §1331 with respect to Schwab's Exchange Act claims and under 28 U.S.C. §1367 with respect to its state-law claims. The district court also found jurisdiction under 12 U.S.C. §632 (Edge Act) and 28 U.S.C. §§1330, 1441, and 1603 (Foreign Sovereign Immunities Act). This Court's jurisdiction arises under 28 U.S.C. §1291; this appeal was timely noticed on April 18, 2016 after final judgment was entered against Schwab on April 11, 2016.

## ISSUES PRESENTED

(1)  Do California courts have specific personal jurisdiction over:

    (a)  The defendant banks that directly sold LIBOR-based instruments to Schwab in California, and/or systematically solicited such business;

    (b)  The remaining defendant banks, based on either their participation in the LIBOR-suppression conspiracy alone or the direct and unavoidable effects of that conspiracy on Schwab in California;

    (c)  All of the defendants based on a national-contacts theory for Schwab's Exchange Act claims; and

    (d)  All of the defendants, due to their forfeiture of any personal-jurisdiction defense.

(2)  Did the district court err in dismissing at the pleading stage:

    (a)  Schwab's fraud allegations regarding fixed-rate, LIBOR-based instruments as premised on an impermissible "fraud-on-the-market" theory;

    (b)  Schwab's Exchange Act claims for lack of loss causation and a connection to the purchase or sale of a security;

    (c)  Schwab's unjust-enrichment claims as untimely; and

(d)   Schwab's conspiracy allegations as implausible.

## STATEMENT OF THE CASE

**I.      Factual Background**

Because the alleged facts surrounding defendants' intentional manipulation of LIBOR were detailed in the briefs and opinion in the *Gelboim* appeal, *see* CA2 Dkt. #13-3565, Doc. 342, at 5-19; Doc. 513, at 16-32; *Gelboim*, 823 F.3d at 765-67, 780-82, this background is limited to only those factual issues necessary to this appeal.

1.   During the period relevant to Schwab's claims, LIBOR was used to determine interest rates for trillions of dollars in floating- and fixed-rate financial instruments around the world.  A767-70, 866-67 (¶¶5, 7, 11-12, 268-70).  To set it, the British Bankers' Association (BBA) received daily submissions from sixteen "panel banks" respecting the rate at which they believed they could borrow money in the interbank market for various currencies, and then calculated an average for each currency.  This case is about U.S.-Dollar LIBOR in particular, referred to herein as "LIBOR" for convenience.

Because LIBOR has long been perceived as reliable and is recalculated daily, market participants commonly use it to set the interest rate on floating-rate instruments.  The typical formula is a spread against LIBOR (*e.g.*, "LIBOR +/- [X] basis points").  A768 (¶7).  In *Gelboim*, 823 F.3d at 780-82, this Court held that

4

plaintiffs (including Schwab) had plausibly alleged that defendants conspired from at least August 2007 to May 2010 to secretly suppress their LIBOR submissions to the BBA and thereby suppress LIBOR itself.

For investors like Schwab, defendants' LIBOR suppression caused three critical and related effects. First, it caused Schwab and others to perceive the banks as safer borrowers, both because LIBOR in general was too low, and because each bank's LIBOR submissions—which are published after LIBOR is calculated—were too low as well. A784 (¶64). Because low rates are associated with lower risk, Schwab and other investors were misled about the riskiness of lending money to the banks, and accordingly did not receive prices or interest rates (or a combination of the two) that were commensurate with those risks in any given LIBOR-based instrument. JA767-69, 782-84, 866-67 (¶¶5, 10-11, 58, 64-65, 268-70). Second, it caused Schwab to earn lower returns, including less interest, on floating-rate instruments that it held, because their interest rates were directly tied to LIBOR. A866-67 (¶269). And third, it detrimentally affected the prices and interest rates of Schwab's fixed-rate instruments, lowering their overall rate of return. A867 (¶270). That is because Schwab followed the common industry practice of evaluating those fixed-rate instruments according to the difference (or "spread") they offered vis-à-vis LIBOR. A767-69, 782-84, 866-67 (¶¶5, 11, 58, 270). A large positive spread might make the offering attractive, depending on the

credit risk of the issuer, while a lower positive spread or a negative spread might do the opposite. A867 (¶270); *see also* Goldman Decl. ¶3, *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, No. 11-MDL-2262 (S.D.N.Y. filed Aug. 5, 2016) (ECF No. 1512) ("Goldman Decl."); Hastings Decl. ¶4, *id.* (ECF No. 1513) ("Hastings Decl."); Klingman Decl. ¶5, *id.* (ECF No. 1514) (Klingman Decl.").[2] Indeed, the ultimate effect of defendants' LIBOR manipulation was to alter the overall mix of credit risk, purchase price, and interest rate in any given LIBOR-based instrument in a way that hurt the total rate of return investors like Schwab received relative to what they should have gotten.

This Court has already endorsed the plausibility of these allegations, based on, among other things, defendants' "common motive[s] to conspire—increased profits and the projection of financial soundness." *Gelboim*, 823 F.3d at 781-82. Simply put, by understating their borrowing costs to the BBA, defendants caused LIBOR to be set at artificially low levels, and so paid less to borrow money from Schwab and other investors, A767-70, 781-84, 866-75 (¶¶5-12, 56-63, 65, 268-

---

[2] These declarations were submitted to the district court in connection with new briefing the court ordered, in the wak of *Gelboim*, on personal jurisdiction and standing with respect to Schwab's and other plaintiffs' antitrust claims. Defendants nonetheless have objected to including them in the Joint Appendix for this appeal. Given the procedural peculiarities that caused Schwab's claims to proceed in separate actions, *see infra* p.13-14, and the declarations' clear relevance to this appeal, the Court can and should consider them. But, in any event, Schwab's allegations about defendants' California conduct (*e.g.*, A773 (¶¶21, 22)), which must be accepted as true at this stage, suffice to plead jurisdiction.

300), while also projecting far more financial stability than the banks actually had amid the financial crisis. A784 (¶64).

2. The Schwab plaintiffs are all headquartered in or managed from San Francisco, *see* A774-76 (¶¶25-37), and they all purchased the relevant instruments through Schwab's trading desk there. A773 (¶21). And, ultimately, those transactions amounted to *hundreds of billions of dollars* in sales of LIBOR-related instruments by (certain of) the defendants[3] to Schwab in California over the relevant period. A767-73, 866-75 (¶¶5, 21, 268-300).

Moreover, many of the defendants—or their affiliated broker/dealers— solicited Schwab directly in California for the purchase of LIBOR-based instruments (some of which were also issued by defendants), and those sales were completed in California as well. A767-81, 866-75 (¶¶5, 9-13, 21, 25-53, 268-300); Dkt. #13-3565 Doc. 464, at i-vii, ix-x (corporate-disclosure statement). In fact, essentially every day throughout the relevant period, most of the defendants solicited Schwab in San Francisco to invest in LIBOR-based instruments, including through phone calls, emails, Bloomberg messages, and other forms of communication with Schwab's San Francisco-based trading personnel. A767-81, 866-75 (¶¶5, 9-13, 21, 25-53, 268-300); Goldman Decl. ¶¶1-6; Hastings Decl. ¶¶1-

---

[3]     As further explained below, most of the defendants engaged in sales to and/or solicitations of Schwab in California, either by those defendants themselves or their broker-dealer affiliates, but some did not. *See infra* p.17-18.

4; Klingman Decl. ¶¶1-4. Defendants caused offering materials regarding the LIBOR-related instruments they issued to be disseminated to Schwab in California as well. A769, 773, 876-79, 885-88 (¶¶10, 21, 306-21, 366-78). And in all these transactions and communications with Schwab in California, defendants failed to disclose the crucial fact that they were conspiring together to willfully manipulate LIBOR, such that (among other things) the interest rates being offered on these LIBOR-based financial instruments were artificially suppressed. *Id.*; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 728 (S.D.N.Y. 2013) ("*LIBOR I*") (holding that those misstatements or omissions could give rise to a claim for securities fraud).

Operating exclusively through its San Francisco-based trading desk, Schwab invested in approximately *$665 billion* in financial instruments tainted by defendants' manipulation of LIBOR—many of which were issued by a defendant, sold directly by a defendant or through its broker-dealer affiliate, or both. A767-73, 866-75 (¶¶5, 21, 268-300). For all of those purchases, Schwab was misled into accepting lower interest rates—*i.e.*, a lower price for the money it was lending—because the banks made debt in general look less risky (and therefore cheaper) than it really was, and also misrepresented their own individual credit risk, making buyers like Schwab more willing to take on their obligations at lower rates. *See, e.g.*, A769-70, 866-75 (¶¶11-12, ¶¶268-300); Goldman Decl. ¶¶9-10; Hastings

Decl. ¶¶6-7; Klingman Decl. ¶¶5-9.  That detriment to Schwab created increased profits for the defendants, both as issuers and as sellers of LIBOR-based instruments.  *Gelboim*, 823 F.3d at 781-82.

3.    Defendants' conspiracy to manipulate LIBOR was inherently self-concealing, making it very difficult for Schwab and others to uncover.  Indeed, Schwab's complaint includes detailed, highly specific allegations regarding the extent to which defendants affirmatively worked to conceal their fraud, and the extent to which those efforts misled Schwab.  *See* A857-62 (¶¶234-55).  Accordingly, the earliest that Schwab had any serious reason to suspect defendants' misconduct was March 15, 2011, when UBS disclosed in an SEC filing that it had "received subpoenas" from the Securities and Exchange Commission, the Justice Department, and the Commodity Futures Trading Commission "in connection with investigations regarding submissions to the [BBA]," and that it was UBS's understanding "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times."  A856, 865 (¶¶231, 262).  Before that, defendants' secret LIBOR-fixing conspiracy was—unsurprisingly—a secret.

Importantly, LIBOR panel banks' actual or reasonably expected borrowing costs are not publicly disclosed, making it impossible for investors like Schwab to

discern malfeasance without sophisticated expert analysis that Schwab had no reason to conduct until well after the relevant period. A857 (¶235). That is particularly true because the banks' manipulation coincided with the extraordinary disruption that affected financial markets surrounding the Lehman Brothers bankruptcy, masking the true, nefarious reasons for LIBOR's aberrant behavior at that time. A857 (¶236). In the midst of that crisis, with its largely unprecedented market conditions, there was no way for Schwab to know that it was a victim of misconduct rather than a victim of the circumstances afflicting the economy as a whole.

Although questions regarding LIBOR's accuracy began to emerge in newspaper articles around the spring of 2008, Schwab had no reason to connect the reported aberrations to wrongdoing, rather than those extraordinary economic circumstances. In fact, defendants aggressively invoked those circumstances as part of their intensive cover-up. Several defendants as well as the BBA steadfastly denied LIBOR was being manipulated, and the BBA even embarked on a "charm offensive" designed to put any market concerns to rest. A858-62 (¶¶237-55). Those efforts included the following, among others:

- In the wake of an April 16, 2008 *Wall Street Journal* article, the BBA contacted investors and journalists to dispel concerns regarding LIBOR. A859 (¶245). The BBA announced it would expel any panel bank that deliberately submitted inaccurate LIBOR quotes and further stated it would conduct an expedited "intensive

review" of its LIBOR process but did not believe panel banks had submitted false quotes. A860 (¶246);

- On April 21, 2008, Dominic Konstam of Credit Suisse stated low LIBOR rates were attributable to "[b]anks … hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply." A860 (¶247);

- In an April 28, 2008 *Financial Times* interview, Konstam attributed "[t]he main problem with LIBOR [to] the capital strains facing banks," and dismissed "talk of the rate being manipulated and not representative of the true cost of borrowing." A860 (¶249);

- On May 16, 2008, JPMorgan stated: "The LIBOR interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch." A861 (¶250);

- Also that day, Colin Withers of Citigroup assured the public of LIBOR's reliability, emphasizing "the measures we are using are historic—up to 30 or 40 years old." A861 (¶251);

- In response to the *Journal*'s request for comment in May 2008, numerous defendants made affirmative representations designed to conceal their wrongdoing. A861 (¶252). On May 29, 2008, for instance, Citibank affirmatively claimed innocence and stated it "continued to submit [its] LIBOR rates at levels that accurately reflect [its] perception of the market." *Id.* HBOS similarly asserted that its LIBOR quotes constituted a "genuine and realistic" indication of the bank's borrowing costs. *Id.*

In short, defendants' and the BBA's words of comfort reassured investors that reported aberrations surrounding LIBOR were attributable to the extraordinary conditions of the financial crisis, and not misconduct. Indeed, defendants'

11

conspiracy *successfully continued for years* after those articles emerged. In contrast, soon after disclosures indicating potential misconduct surfaced in 2011, Schwab and others sued for relief. A770 (¶14).

## II.   Procedural History

In August 2011, Schwab plaintiffs filed separate but substantively identical complaints in the Northern District of California, asserting both federal and state claims, and both antitrust and common-law causes of action. Those cases were transferred for pretrial purposes to the MDL court below, and amended complaints were filed in April 2012.

In March 2013, the district court dismissed Schwab's complaints in their entirety. *See LIBOR I*, 935 F. Supp. 2d at 685-95, 724-34, 735-36. The court dismissed with prejudice Schwab's federal and state antitrust claims for lack of antitrust injury (a holding this Court has since vacated, *see Gelboim*, 823 F.3d at 771-77), and dismissed Schwab's other state-law claims without prejudice after declining supplemental jurisdiction. Importantly for this appeal, the court also dismissed Schwab's claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) as barred by Section 107 of the Private Securities Litigation Reform Act (PSLRA), which precludes RICO claims premised on "any conduct that would have been actionable as fraud in the purchase or sale of securities," 18 U.S.C. §1964(c). *LIBOR I*, 935 F. Supp. 2d at 727-31. In so doing,

12

the district court held that (i) "the material misrepresentations or omissions in the offering materials sent to plaintiffs were clearly made in connection with the purchase or sale of securities" for purposes of Section 10(b) of the Exchange Act; and (ii) "because defendants' alleged misrepresentations to the BBA were allegedly made for the purpose of profiting unfairly from their sale of securities to plaintiffs, defendants' misrepresentations to the BBA were made 'in connection with' the sale of securities," as well. *Id.* at 728-30.

The district court's decision set Schwab's claims on dual tracks: The dismissed antitrust claims were appealed to this Court, while Schwab refiled the dismissed state-law claims in California state court on April 29, 2013. This Court then reversed the district court's antitrust holdings, and its mandate returned those claims to the district court, where they are now subject to yet another motion to dismiss, this time for lack of personal jurisdiction and antitrust standing. Meanwhile, once Schwab refiled its state-law claims in state court, defendants removed that case and successfully petitioned to bring it straight back to the LIBOR MDL. The result is that Schwab has multiple complaints in connection with the same MDL proceeding in syncopated fashion between the district court and this Court.

Schwab ultimately filed an amended complaint in this case asserting claims against all defendants for, *inter alia*, (1) fraud, (2) breach of the implied covenant

13

of good faith and fair dealing, (3) unjust enrichment, (4) tortious interference, and (5) violations of Sections 10(b) and 20(a) of the Exchange Act. A876-91 (¶¶306-405). Schwab also alleged that defendants participated in a conspiracy, which under California law does not constitute an independent tort but holds all conspirators liable for their co-conspirators' acts. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 459 (Cal. 1994). Defendants moved to dismiss, and Schwab opposed, leading to the decision on review.

That decision, known as *LIBOR IV*, consists of a 436-page omnibus memorandum and order addressing claims by Schwab and numerous other "direct action" (*i.e.*, non-class) plaintiffs. In extraordinary and confusing fashion, it sets forth the district court's general reasoning on numerous matters but rarely deals directly with the specific allegations made by the various individual plaintiffs, and so does not actually provide any concrete ruling on many of Schwab's claims. Instead, the court directed the parties "to confer and provide us with a spreadsheet containing a list of claims that, in accordance with the conclusions [in *LIBOR IV*], are dismissed on jurisdictional grounds." SPA92. Although the court expressed its belief that "no complaint [wa]s dismissed in its entirety," SPA431, that was incorrect: After five months of correspondence, the parties filed a joint submission noting areas of assent and disagreement, including their mutual view that all Schwab's claims were indeed dismissed. *See* SDNY Dkt. #11-md-2262 Doc.

14

1303.  Schwab accordingly requested that the district court enter judgment, which it did on April 11, 2016.[4]

Four aspects of that decision are relevant to this appeal.

*First*, the court dismissed Schwab's sclaims for lack of personal jurisdiction. SPA46-95.  It essentially reasoned that, because LIBOR-based instruments can move among entities and thus throughout the world, personal jurisdiction lies only where: (i) permitted by a forum-selection clause; (ii) defendants' submitted their false LIBOR submissions; or (iii) defendants issued LIBOR-based instruments. SPA92-93.  The court thus dismissed Schwab's claims against all of the defendants, even if they sold LIBOR-based instruments directly to Schwab in California.  SPA91-95.  The court reinforced that ruling by holding that there was no plausible allegation of a conspiracy, which further prevented personal jurisdiction over the defendants.  SPA70-71.  Finally, it rejected any argument that defendants had forfeited their personal jurisdiction defenses by failing to assert them against Schwab's initial 2011 complaints.  SPA88-91.

*Second*, despite upholding fraud claims arising from transactions in floating-rate instruments, the court dismissed Schwab's fraud claims arising from Schwab's transactions in fixed-rate instruments, characterizing them as premised on an

---

[4]     Given *LIBOR IV*'s failure to specify its conclusions for particular claims by particular plaintiffs, this appeal relies to some extent on Schwab's own interpretation of how the district court's rulings apply to its claims.

impermissible "fraud-on-the-market" theory. SPA161-62. In so doing, the court did not address Schwab's factual allegations that it received lower overall returns on fixed-rate instruments due to defendants' fraudulent manipulation of LIBOR. *Compare id. with* A867, 876-79 (¶¶270, 306-25).

*Third*, although the court correctly held that most of Schwab's claims were timely, it dismissed Schwab's unjust-enrichment claims as partially time-barred on the erroneous belief that articles published in April and May 2008 adequately placed Schwab on inquiry notice of its claims. SPA427-30. That holding was specifically tied to earlier rulings on timeliness issues regarding other plaintiffs. *Id.*

*Fourth*, and finally, the court held that Schwab failed to state claims under Sections 10(b) and 20(a) of the Exchange Act because, according to the court, (i) Schwab did not adequately allege a cognizable theory of loss causation and (ii) the alleged fraud did not occur "in connection with the purchase or sale of a security." SPA172-75. The court interpreted Schwab's claims as arising from multiple theories—including that Schwab "bought LIBOR-based bonds during the persistent suppression period at an artificial price" and "received artificial interest payments during the persistent suppression period." *Id.* It deemed the first theory "illogical" because it assumed that any decrease in interest rate would be offset by a corresponding decrease in the price of the security. *Id.* And the court rejected

16

the second theory on the ground that receiving interest payments does not constitute a "purchase or sale of securities," as required to state a claim. *Id.* Apparently recognizing the tension between those rulings and its ruling in *LIBOR I* that the alleged misconduct was "actionable as fraud in the purchase or sale of securities," *see supra* p.46-48, the court stated only that its prior ruling was based on securities claims the SEC, rather than Schwab, could pursue. SPA175.

This appeal followed.

## SUMMARY OF ARGUMENT

The district court manifestly erred in dismissing Schwab's state-law claims for want of personal jurisdiction. Ten of the defendant banks (referred to below as the "selling defendants") actually sold LIBOR-based instruments directly to Schwab in California—either themselves or through their affiliated broker-dealers.[5] They also directly solicited Schwab in California for the sale of such financial instruments, and disseminated offering materials to Schwab in California for those instruments. The district court has itself acknowledged that defendants' misrepresentations and omissions about LIBOR manipulation associated with those sales and communications give rise to multiple common-law claims in contract and fraud. *See, e.g.*, *LIBOR I*, 935 F. Supp. 2d at 726-31. That should

---

[5] The ten relevant bank families are (1) Bank of America; (2) Barclays; (3) Citibank; (4) Credit Suisse; (5) Deutsche Bank; (6) HSBC; (7) JPMorgan Chase; (8) Royal Bank of Canada; (9) Royal Bank of Scotland; and (10) UBS.

have sufficed: The archetypical case for specific personal jurisdiction involves a defendant who engages in a tortious transaction with the specific plaintiff in its home state, and accordingly, this Court's binding precedents have found specific personal jurisdiction in cases that are far more difficult than this one.

That said, the district court also erred in rejecting personal jurisdiction over the "non-selling defendants" for at least four reasons—some of which apply to the selling defendants as well.[6]

*First*, California's obvious personal jurisdiction over the selling defendants extends to all members of defendants' conspiracy, including the non-selling defendants. The district court's sole reason for concluding otherwise—*i.e.*, that there was no plausibly alleged conspiracy—has already been abrogated by this Court. Moreover, while defendants have challenged conspiracy-based jurisdiction as inconsistent with due process, it follows directly from the rule that an agent's actions in a forum can create minimum contacts for its principal—a rule the Supreme Court has recently and expressly endorsed. *See Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). The "conspiracy principle" is thus routinely applied by federal courts, and is consistent with the minimum requirements of the Due

---

[6] These non-selling banks are (1) Bank of Tokyo-Mitsubishi; (2) Rabobank; (3) Lloyds; (4) HBOS; (5) Norinchukin; and (6) Portigon (f/k/a WestLB, and its former subsidiary Westdeutsche ImmobilienBank).

Process Clause—the sole basis of defendants' personal-jurisdiction challenge below.

*Second*, under the unique circumstances of this case, *all* of the defendants' actions in manipulating LIBOR sufficed to create minimum contacts with California with respect to Schwab's claims. To increase their own profits, defendants conspired to manipulate the world's most important financial figure. And Schwab is a massive institutional investor—it operates in the world's sixth-largest economy; it has invested in *hundreds of billions* in LIBOR-based instruments directly affected by defendants' misconduct; and many of those instruments were sold and/or issued by certain of the defendants themselves. All of the defendants would thus have known and expected that claims in California by Schwab would follow if their massive conspiracy were uncovered. The effects of defendants' concerted LIBOR manipulation on plaintiffs like Schwab in California follow so clearly and directly that none could possibly argue that being haled into California courts on Schwab's claims was an unfair or surprising product of "fortuitous" or "plaintiff-driven" conduct, rather than a product of their own wrongdoing itself.

*Third*, jurisdiction exists over some or all defendants through the Exchange Act, which contains a worldwide service provision and is thus subject to a "national," rather than California-specific, contacts analysis.

19

*Fourth*, defendants—who waited *more than three years* to raise personal jurisdiction, and secured a substantive dismissal under Rule 12(b)(6) in the interim—have forfeited a personal-jurisdiction defense in any event.

The district court's other dismissals under Rule 12(b)(6), addressed in Part II below, likewise do not withstand scrutiny. In general, these holdings arise from the district court's disregard of Schwab's pertinent allegations or improper resolution of contested factual issues at the pleading stage. This includes some issues on which this Court has already nullified the district court's reasoning, and some on which the district court seems to now disagree with itself.

To begin, in dismissing Schwab's fraud-related claims to the extent they arise from fixed-rate instruments, the court simply mischaracterized Schwab's case. The court, in a single paragraph, conceptualized these as "fraud-on-the-market"-type claims that relied on efficient market forces to embed defendants' false information into otherwise reliable prices. SPA161-62. But that is just not Schwab's allegation. Instead, Schwab alleges that *it* determined the right interest rates and prices for its fixed-rate purchases in part based on LIBOR, and so was misled in those transactions by defendants' manipulations. A767-70, 867-75 (¶¶5, 11-12, 270-300). The court's dismissal of those claims without allowing for the factual development necessary to test Schwab's well-pleaded allegations is contrary to basic 12(b)(6) principles.

20

The court's dismissal of Schwab's Exchange Act claims for lack of loss causation and failure to allege that the fraud occurred "in connection with the purchase or sale of a security" rests on a similar infirmity. Notably, in *LIBOR I*, the district court concluded that Schwab's allegations could amount to a claim of securities fraud "in connection with the purchase or sale of a security." The court's new contrary view is obviously incorrect, insofar as Schwab claims that *sales* of LIBOR-related securities were materially fraudulent for failing to disclose LIBOR manipulation—a theory that, again, the district court has already endorsed. *See LIBOR I*, 935 F. Supp. 2d at 726-31. The district court's view ultimately boils down to its assumption that LIBOR suppression could not have harmed Schwab in connection with the sale of securities because it tended to drive the sales price down. But, again, this simply disregards Schwab's concrete allegations that it was harmed in those purchase by receiving rates and prices that, *together*, generated overall returns that were lower than they should have been—a quintessentially factual issue that cannot be resolved against Schwab at this stage.

The court's dismissal of Schwab's unjust-enrichment claims to the extent they arose before August 23 or 27, 2008—three years before Schwab's initial cases were filed—rests on a similar error. Again, Schwab's complaint is exceedingly detailed on what Schwab knew about defendants' wrongdoing and why their statements tended to conceal it, and the court simply failed to address those

allegations on an individualized basis. A856-65 (¶¶231-62). Accordingly, the court's reasoning directly contradicts *BPP Illinois*, where this court held that pleading-stage dismissal of a plaintiff's LIBOR-related claims on the basis of *the very articles the district court considered here* was entirely premature.

Finally, the district court's determination that Schwab did not plausibly plead conspiracy must be reversed in light of *Gelboim*. This, again, was a factual dispute the district court prematurely resolved instead of allowing discovery.

Given the district court's troubling pattern of deciding pleading motions as if they had a full factual record (when, in fact, the court stayed discovery), it is important that this Court substantially correct this case's course. The errors below should be reversed, and Schwab's claims should finally proceed.

## STANDARD OF REVIEW

This Court reviews dismissal for lack of personal jurisdiction *de novo*. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). Schwab need make only a *prima facie* showing of personal jurisdiction to defeat defendants' pre-discovery motion. *S. N. Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). Schwab's complaint and supporting affidavits are construed "in the light most favorable to [Schwab] and resolving all doubts in [its] favor," notwithstanding a controverting presentation by defendants. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

Similarly, "[w]hether a complaint alleges sufficient facts to state a claim on which relief can be granted is a question of law," which this Court "consider[s] *de novo*." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). The Court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Id.*

## ARGUMENT

### I. The District Court Erred In Holding That California Courts Lacked Personal Jurisdiction Over Defendants.

#### A. The California courts clearly have specific personal jurisdiction over the selling defendants.

The selling defendants are plainly subject to jurisdiction in California based on their solicitation of Schwab in California and their actual sales of LIBOR-based instruments to Schwab in that forum. *See* A773, 866-75 (¶¶21-22, 268-300); Goldman Decl. ¶¶1-6; Hastings Decl. ¶¶1-4; Klingman Decl. ¶¶1-5. Indeed, the district court's contrary conclusion is extreme. Under that view, California courts cannot constitutionally exercise jurisdiction over claims by California investors against issuers and/or sellers of those financial instruments who cause them to be disseminated to those investors *in California*. If that were so, countless decisions of this Court and the Supreme Court would necessarily be incorrect, and the ability

of local courts to protect their citizens from torts occurring in the jurisdiction would be radically constrained.

As an initial matter, all aspects of this personal jurisdiction dispute are matters governed by federal precedent, rather than state law. Because Schwab's case was initiated in California state court, the jurisdictional analysis turns on whether a California court could properly exercise personal jurisdiction over defendants. *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987). And while that is a question of state law insofar as it turns on the reach of California's long-arm statute, that statute reaches to the full extent of the federal Due Process Clause, *Bristol-Myers Squibb Co. v. Superior Court*, 206 Cal. 3d 636, 642-43 (2016), and the jurisdiction permitted by the federal Constitution is a question of federal law controlled by this Court's own precedent (along with the Supreme Court's). *Chew v. Dietrich*, 143 F.3d 24, 30 (2d Cir. 1998). Indeed, defendants waived reliance on statutory long-arm arguments below, and the district court itself rejected the view that exercising personal jurisdiction would be "unreasonable" under federal constitutional law. SPA52, 81-82. Accordingly, this question boils down to whether Schwab adequately alleged "minimum contacts" with California for purposes of federal due process. And that minimum-contacts question is analyzed under Second Circuit (and Supreme Court) precedent. *Menowitz*, 991 F.2d at 40-41.

Among the core principles governing that federal minimum-contacts analysis is that a defendant's actual entry into a forum—either "in person or through an agent, goods, mail, or some other means"—extends personal jurisdiction to that forum's courts. *Walden*, 134 S. Ct. at 1122. Accordingly, the selling defendants subjected themselves to personal jurisdiction in California by selling billions of dollars in LIBOR-based instruments to Schwab through its trading desk in San Francisco, whether they did so themselves or through their affiliated broker-dealers. A773, 868 (¶¶21, 273-74). We are not aware of a single case in which a defendant who violated state law in marketing and selling a product to a plaintiff in a particular state was nonetheless constitutionally immune from the personal jurisdiction of that state's courts.

Moreover, the selling defendants' contacts with California actually went well beyond merely selling securities to Schwab there. Defendants or their agents also (i) routinely communicated with Schwab's San Francisco trading desk during the relevant period to solicit Schwab's investment in LIBOR-based instruments, and (ii) sent offering materials or other documentation to Schwab in San Francisco that likewise falsely stated LIBOR was being properly calculated or failed to disclose that it was being artificially suppressed. A769-73, 876-79 (¶¶10, 21, 306-25); Goldman Decl. ¶¶1-6; Hastings Decl. ¶¶1-4; Klingman Decl. ¶¶1-5; *supra* p.7-

8. These persistent, purposeful, and pervasive contacts with Schwab in California bring this case well within that state's jurisdictional reach.

Nor can there be any credible argument that defendants' pervasive contacts with California lack the required "nexus" to Schwab's claims. "The nexus requirement … merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum." *Chloé v. Queen Bee of Beverly Hills*, 616 F.3d 158, 167 (2d Cir. 2010). The nexus here is far closer than that: Schwab's claims against the selling defendants "arise[] out of the very activit[ies] being conducted, in part, inside" California. *Licci*, 732 F.3d at 170. That is so *both* because Schwab's claims derive from instruments sold in California *and* because they stem, in part, from the misstatements or omissions defendants disseminated to Schwab there. *See, e.g.*, A769-73, 876-79 (¶¶10, 21-22, 306-25); Goldman Decl. ¶¶1-6; Hastings Decl. ¶¶1-4; Klingman Decl. ¶¶1-5; *LIBOR I*, 935 F. Supp. 2d at 728. Defendants' connections to California thus sufficiently "relate to" Schwab's claims to support personal jurisdiction. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (Sotomayor, J.) (noting breadth of this inquiry).

The district court nonetheless found minimum contacts lacking—perhaps because it failed to actually consider Schwab's particular allegations. The court instead held generally that jurisdiction existed over claims against bond obligors

(issuers) like defendants only (1) where permitted by a contractual forum-selection clause; (2) "where the defendant's LIBOR submission was determined or transmitted"; or (3) "where the bond was issued (*i.e.*, where the bond was placed with an underwriter or agent for sale or marketing)." SPA92-93. The court further determined jurisdiction could not lie "where a plaintiff suffered injury" because "a bond, once issued, may be traded anywhere in the world without action by the issuer," SPA93, making harm in any particular jurisdiction a product of "fortuitous, plaintiff-driven contact." SPA77. There are at least two related, and insurmountable, problems with the court's analysis.

*First*, it has essentially nothing to do with Schwab's case. The selling defendants are liable to Schwab not only to the extent they issued LIBOR-based financial instruments affected by those defendants' suppression of LIBOR, but also to the extent they solicited Schwab in California and *actually sold* affected financial instruments to Schwab there. A769-73, 866-75 (¶¶10, 21, 268-300). As Schwab specifically alleged, A773 (¶22), those solicitations and sales amounted to tortious misconduct occurring *in* California, which surely suffices for personal jurisdiction. *See, e.g.*, *Walden*, 134 S. Ct. at 1123-24 (observing that in *Calder v. Jones,* 465 U.S. 783 (1984), "because publication to third persons [wa]s a necessary element of libel, the defendants' intentional tort actually occurred *in* California"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL

27

1268267, at *4 (S.D.N.Y. Mar. 31, 2016) ("Specific jurisdiction exists 'when the cause of action arises out of the very activity being conducted, in part, inside the forum.'") (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)). Even were there not such a direct connection between Schwab's claims and defendants' contacts with California, Schwab meets the minimal "related to" standard articulated in *Bank Brussels*.

In any event, the court failed even to consider those issues because it made no reference to Schwab's actual allegations—*i.e.*, that the selling defendants solicited business from Schwab in California, provided offering materials to Schwab in California, and sold LIBOR-based financial instruments to Schwab in California. A769-73, 866-75 (¶¶10, 21-22, 268-300).[7] Those were not "fortuitous" or "plaintiff-driven" California contacts. Quite the opposite: *Defendants* chose to engage with Schwab there—through hundreds, if not thousands, of transactions collectively worth billions of dollars. *See Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (jurisdiction in New York existed where defendant "initiated its debt collection efforts in an active (rather than responsive) attempt to collect money from two New York residents").

---

[7] That defendants did not physically enter California in connection with these transactions is irrelevant. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (in light of the "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State").

28

*Second*, and relatedly, the district court took a myopic view of where defendants' misconduct "occurred." Instead of looking to where defendants' made their fraudulent transactions, the court looked only to where "defendants' LIBOR manipulation took place." SPA78. It thus held that jurisdiction was proper "in the forum containing the office from which a defendant determined, or transmitted, a false LIBOR submission," on the ground that "the false submissions were made in the context of the defendant's purposeful availment of the privilege of doing business in the forum." *Id.* That conception of the relevant conduct for personal jurisdiction was too restrictive in light of governing precedent.

For example, while the district court attempted to analogize this case to *World-Wide Volkswagen*, that decision actually *supports* the exercise of jurisdiction in California. The plaintiff in that case had bought a car from a retailer that operated solely in the northeastern United States and then drove it to Oklahoma, where the allegedly tortious accident occurred. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 288, 295-99 (1980). The Supreme Court held that, because the defendant "solicit[ed] no business" in Oklahoma and did not seek "to serve the Oklahoma market," the Oklahoma courts lacked personal jurisdiction regardless of plaintiff's own conduct in bringing the car there. *Id.* at 295-96. In this case, the district court evidently reasoned that LIBOR-based instruments are like cars in that they lie outside the seller's control after they are

29

sold, and thus defendants are immune from personal jurisdiction in the various states where their LIBOR-based instruments merely ended up. But that analysis misses Schwab's key point: Defendants here are not like a northeast retailer being haled into the Oklahoma courts; they are like a northeast retailer being haled into the courts *of the northeast*—the forum where they *actually sold* the allegedly tortious products. Indeed, *World-Wide Volkswagen*'s premise is that jurisdiction lies where the sale occurred, rather than where the car ended up. *See id.* at 297-98 ("The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."); *see also, e.g.*, *Calder*, 465 U.S. at 788-90 (defendants who wrote and edited allegedly defamatory article in Florida but published it in a magazine distributed in California were subject to the jurisdiction of a California court); A773 (¶22) (specifically alleging that the bulk of defendants' tortious conduct against Schwab occurred in California).

Two cases from this Court drive the error home. In *Chloé*, the Court held that by merely offering counterfeit handbags for sale to New Yorkers on a website, the defendant had established minimum contacts for purposes of personal jurisdiction in the New York courts, even though the counterfeiting itself occurred elsewhere. 616 F.3d at 170. And in *Bank Brussels*, the Court held that a Puerto

Rican law firm that wrote an allegedly tortious opinion letter in Puerto Rico about matters of Puerto Rican law respecting a security interest located in Puerto Rico was nonetheless subject to personal jurisdiction in New York because the firm was working for a New York client, and had engaged in various activities in New York to build a market for its services. 305 F.3d at 127-30. The selling defendants here have contacts with New York that are far stronger than the defendants in either of those cases because, among other things, they affirmatively sought out Schwab itself as a purchaser in California, and then actually made sales to Schwab there. *See* A769-73, 866-75, 876-79 (¶¶10, 21, 268-300, 306-25); Goldman Decl. ¶¶1-6; Hastings Decl. ¶¶1-4; Klingman Decl. ¶¶1-5.

Accordingly, the district court's contrary approach—looking only to where certain conduct occurred rather than to where the tort was directed or completed—is a dangerous break from settled precedent. The law firm in *Bank Brussels*, for example, wrote its opinion letter in Puerto Rico but was subject to personal jurisdiction in New York. And the defective car at issue *World-Wide Volkswagen* presumably was designed in Germany, but that did not preclude the exercise of personal jurisdiction in those states where the cars were sold. Were the rule otherwise, all product-liability claims would have to be brought not where defendants sold the affected product to the plaintiff, but in the place where the product was designed or corrupted—which might be a world away. Foreign firms

31

disseminating dangerous and harmful products throughout the U.S. would be effectively immune from product-liability actions in this country. Further, plaintiffs would be forced to institute numerous cases across the country—or around the globe (to the extent foreign law even allowed it)—to seek relief. That never has been and could not possibly be the law.

Perhaps for those reasons, even the district court itself did not seem to fully endorse its own view. Instead, it articulated the principles that should have led to jurisdiction over the selling defendants in Schwab's case—acknowledging, for example, that "personal jurisdiction is likely to exist where the defendant 'reaches out beyond one state and creates continuing relationships and obligations with citizens of another state,'" SPA76 (quoting *Burger King*, 471 U.S. at 473)—it just failed to properly apply those principles to Schwab's allegations. Clearly, the selling defendants here "reached out" to Schwab in California, and so created continuing financial obligations to Schwab in that forum. That is enough to create personal jurisdiction in the California courts.

In a final error, the district court misread *Chew*, 143 F.3d at 24, and other decisions of this Court to require at least a "but for" causal connection between a defendant's forum-related contacts and plaintiff's injury. That is affirmatively *not* the standard articulated in *Bank Brussels*, which relied on business contacts the defendant had with New York that had no causal connection to the defendant's

alleged malpractice tort against the plaintiff. But, in any event, but-for causation is amply pleaded here. Had the selling defendants not solicited or sold to Schwab in California, or had they not made those products available for sale in California, Schwab would not have suffered the losses it did purchasing them (in California). A767-70, 866-75 (¶¶5, 10-12, 268-300). Accordingly, even under the erroneous standard the district court endorsed, it should have found personal jurisdiction with respect to the selling defendants.

### B. Personal jurisdiction lies over the non-selling defendants under the conspiracy rule or the effects test.

As members of the conspiracy to suppress LIBOR, the non-selling defendants are subject to the personal jurisdiction of the California courts to the same extent as their co-conspirator selling defendants. As the district court observed, conspiracy-based jurisdiction rests on the unremarkable principle that "because co-conspirators are deemed to be each other's agents, the contacts that one co-conspirator made with a forum while acting in furtherance of the conspiracy may be attributed for jurisdictional purposes to the other co-conspirators." SPA69 (citing *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir. 1983)). But the district court rejected the application of conspiracy-based jurisdiction because it determined that Schwab failed to plausibly allege a conspiracy. SPA70-71. *Gelboim* negates that ruling. Exercising jurisdiction over the non-sellers based on their participation in a plausibly alleged

conspiracy is therefore warranted, and this Court can reverse the district court's contrary determination without breaking any new ground.

To invoke the conspiracy basis for jurisdiction, a plaintiff need only (1) make "a prima facie showing of conspiracy," (2) allege "specific facts warranting the inference that the defendant was a member of the conspiracy," and (3) "show that the defendant's co-conspirator committed a tort in [the relevant jurisdiction]." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005) (citing *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991)).[8] This Court's holding in *Gelboim* suffices for the first two elements, and the discussion above regarding the commission of fraud and other torts by the selling defendants suffices for the third. Indeed, the district court itself upheld fraud claims arising from banks' failure to inform plaintiffs that LIBOR was suppressed in the course of offering or trading floating-rate instruments (*i.e.*,

---

[8] *See also, e.g.*, *Unspam Techns., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) (setting forth similar pleading standards); *Melea Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007); *Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 666 n.16 (5th Cir. 2004); *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001); *Stauffacher v. Bennett*, 969 F.2d 455, 459–61 (7th Cir. 1992); *Sea Trade Mar. Corp. v. Coutsodontis*, 2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16, 2012) (noting the conspiracy theory for personal jurisdiction is "settled"). That some decisions discuss conspiracy-based jurisdiction under New York's long-arm statute does not undermine their relevance to the minimum-contacts analysis. *See Eades*, 799 F.3d at 168 ("despite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare").

"fraud in the inducement" claims), as well as fraud claims arising from all defendants' false LIBOR submissions to the BBA (*i.e.*, "false data fraud" claims). SPA125-70. All the elements of jurisdiction over all of the defendants under the conspiracy principle have thus already been established in this Court or the district court.

The Defendants nonetheless argued below that conspiracy-based personal jurisdiction conflicts with the principle that jurisdiction must be based on contacts by the defendant "himself" with the forum state. That argument is plainly incorrect.

This Court in *Leasco* endorsed the principle that participants in a conspiracy are subject to the same personal jurisdiction as their co-conspirators. *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341-44 (2d Cir. 1972). Because, as noted above, California's long-arm statute extends to the limit of the Due Process Clause, and the defendants themselves limited their personal-jurisdiction defense to federal due process arguments, *Leasco* constitutes binding precedent as to conspiracy-based jurisdiction. *See supra* p.24. Defendants' argument therefore fails on its face.[9]

_____

[9]    Defendants suggested below that the Supreme Court in *Walden* announced a new rule that invalidates *Leasco*. That is not possible: *Walden* did not involve a conspiracy and does not even mention the word. Moreover, *Walden* itself opined that it turned on "[w]ell-established principles of personal jurisdiction," 134 S. Ct. at 1126, not any new rule, and the district court was accordingly "unpersuaded" by

Further, the conspiracy principle makes perfect sense. The legal connection between co-conspirators is strong enough to render one conspirator *criminally* liable for the acts of another, regardless of the former's knowledge of or specific intent to commit any particular wrongful act. *Pinkerton v. United States*, 328 U.S. 640 (1946). It would hardly make sense to accord conspiracy less force in civil cases than it has in the criminal context. As Judge Posner has explained, when "for most purposes the acts of one conspirator within the scope of the conspiracy are attributed to the others, … we have difficulty understanding why personal jurisdiction should be an exception." *Stauffacher*, 969 F.2d at 459. That is particularly true where, as here, the soliciting and selling of LIBOR-based instruments to Schwab in California—the world's sixth-largest economy—would plainly have been foreseeable to all of the defendant conspirators.

Nor does subjecting defendants to jurisdiction based on their co-conspirators' contacts with the forum state deprive defendants of the requisite "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." *Burger King*, 471 U.S. at 472. Participation in a conspiracy easily meets this requirement. Schwab plausibly alleges that all defendants entered an agreement to artificially suppress LIBOR, and then most of the co-conspirators sold financial instruments to Schwab in California that were affected by the

---

defendants' argument that *Walden* "dramatically revised the law of specific personal jurisdiction." SPA91 n.61.

manipulated LIBOR rates. Defendants "most certainly knew that [they were] affiliating [themselves] with an enterprise" with contacts in California. *Id.* at 480. Personal jurisdiction over defendants does not exist through the happenstance of a third party's actions, but rather is predicated on the agreements and intentional acts of defendants to perpetrate a scheme that directly impacted California, as they well knew it would.

Further, under the facts of this case, the Court does not even need to (re)endorse the "conspiracy-theory" of personal jurisdiction to conclude that all the defendants are subject to personal jurisdiction in California, because the obvious and direct *effects* of the defendants' actions in California suffice. Whatever limits there might be on *Calder's* "effects test", 465 U.S. at 787 n.6, it is broad enough to capture this case. That is particularly true because defendants surely "knew that the brunt of th[e] injury would be felt by" plaintiffs like Schwab in California, *id.* at 789-90, given that (1) defendants conspired to suppress *U.S.-Dollar* LIBOR; (2) Schwab is a massive institutional investor in U.S.-Dollar LIBOR-related instruments; (3) California is the world's sixth-largest economy, the largest economy in the United States itself, and an epicenter of global finance; and (4) defendants' own co-conspirators sold a massive share of the tainted financial instruments to Schwab in California themselves. The effects of defendants' conspiracy to manipulate LIBOR did not reach California because of "a string of

37

fortunate coincidences," *Waldman v. Palestine Liberation Org.*, --- F.3d ---, 2016 WL 4537369, at *19 (2d Cir. Aug. 31, 2016), or because of third-party or plaintiff driven behavior, *compare, e.g.*, *World-Wide Volkswagen Corp.*, 444 U.S. at 295. Instead, California is *exactly* where defendants would have expected to find a huge bulk of the harmed counterparties. Put otherwise, defendants cannot credibly feign surprise or claim unfairness at the idea of being sued in a California court based on the harms that their willful manipulation of "the world's most important number" caused to massive institutional investors like Schwab in that state. Instead, they "must 'reasonably anticipate being haled into court there' to answer for" what they have knowingly done. *Calder*, 465 U.S. at 790 (quoting *World-Wide Volkswagen*, 444 U.S. at 295).

Simply put, defendants' conspiracy easily suffices to extend California's personal jurisdiction to all the defendants here under binding precedent. But even if it didn't, the necessary, direct connection between defendants' malfeasance and the harms caused to investors like Schwab in California would alone subject all of the defendants to the jurisdiction of California courts.

### C. Personal jurisdiction also lies over Schwab's state-law claims by virtue of Schwab's Exchange Act claims.

Because the district court erred in dismissing Schwab's Exchange Act claims, *infra* p.45-50, an independent basis for personal jurisdiction exists over defendants on those claims based on their contacts with the United States as a

whole. The Exchange Act "permits the exercise of personal jurisdiction 'to the limit of the Due Process Clause of the Fifth Amendment.'" *Moon Joo Yu v. Premiere Power LLC*, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)). Personal jurisdiction with respect to Exchange Act claims is accordingly based on *national* contacts, not contacts specifically with California. *Chew*, 143 F.3d at 28 n.4. As an initial matter, jurisdiction thus exists over Bank of America, Citigroup, and JPMorgan by virtue of their U.S. residency. *See Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974) (where "the defendants reside within the territorial boundaries of the United States, the minimal contacts required to justify the federal government's exercise of power over them are present"). And given their conspiracy to manipulate *U.S.-Dollar LIBOR*, the other defendants also have minimum contacts with the United States as a whole to an even greater extent than their contacts with California.

Further, it is appropriate to extend personal jurisdiction over all of Schwab's state-law claims if the Court has jurisdiction for any of them, or for Schwab's claims under the Exchange Act. As the district court held below with respect to other plaintiffs' claims, SPA56-59, Schwab's claims all arise from a common nucleus of operative facts, warranting the exercise of pendent personal jurisdiction over all those claims if the Court is to take jurisdiction over any of them at all.

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993);

*Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 718-21 (2d Cir. 1980).

### D. In any event, defendants forfeited any challenge to personal jurisdiction.

Finally, while Schwab has clearly made a *prima facie* case for jurisdiction over all defendants, the Court actually need not reach that question, as defendants forfeited the defense through their actions with respect to Schwab's claims in the LIBOR MDL. *See City of New York v. Mickalis Pawn Shop*, 645 F.3d 114, 134 (2d Cir. 2011). When considering forfeiture, this Court "consider[s] all of the relevant circumstances," including the passage of time, "the litigation activity that occurred" during that time, and "the opportunities to litigate the jurisdictional issue that were foregone." *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999). Defendants waited *three years* after Schwab's initial cases were filed before raising a personal-jurisdiction defense, and *successfully* sought dismissal of those claims under Rule 12(b)(6) in the meantime. Having evinced an intention to litigate Schwab's claims in the LIBOR MDL, defendants cannot now, paradoxically, disavow jurisdiction by any U.S. court.

To be sure, that might not be true if Schwab's claims had sought to establish *general* personal jurisdiction on the basis of defendants' banking contacts with *New York*. In that case, defendants would be permitted to raise an otherwise untimely personal-jurisdiction defense under *Gucci America, Inc. v. Li*, 768 F.3d

40

122, 135-36 (2d Cir. 2014), which permitted such a defense based on the Supreme Court's recent abrogation of binding Circuit precedent that previously established New York jurisdiction over "a foreign bank with a branch in New York." But Schwab asserted *specific* personal jurisdiction *in California*, and nothing about that assertion was governed by this Court's previous New York rule. Indeed, even if the "one branch" rule had been applicable, several defendants do not have a branch in California at all,[10] and so could have asserted the lack of personal jurisdiction notwithstanding this Court's prior case law.

## II. The District Court Repeatedly Erred In Dismissing Claims By Resolving Contested Factual Disputes In Defendants' Favor.

In addition to its rulings on personal jurisdiction, the district court repeatedly exceeded its authority under Rule 12(b)(6) by deciding contested factual issues in defendants' favor. This Court has already found as much in connection with the district court's conspiracy ruling (which the Court determined was not even a close question), and with respect to antitrust injury. *See Gelboim*, 823 F.3d at 781. With respect to Schwab's claims in particular, the district court also erred in: (1) dismissing Schwab's fraud (and related aiding and abetting) claims to the extent they arose from transactions in fixed-rate instruments (2) dismissing Schwab's Exchange Act claims; (3) dismissing Schwab's unjust-enrichment claims as

---

[10] *See, e.g.*, JA1190-91 (Decl. of N. Black) ("HSBC Bank plc has no offices, branches, or other regular place of business in any of the Subject States or in any other state in the United States."); JA1136 (Decl. of E. Williams) (same).

untimely to the extent they arose before August 23 or 27, 2008; and (4) holding that Schwab failed to plausibly allege a conspiracy.

### A. The district court erred in dismissing Schwab's fraud claims arising from fixed-rate transactions.

The district court committed a basic, procedural error in holding that Schwab could not pursue fraud claims with respect to its purchase of fixed-rate instruments. Although those instruments were not expressly denominated in terms of LIBOR, Schwab plainly and specifically alleged that defendants' fraudulent suppression of LIBOR materially affected its transactions in fixed-rate instruments, because Schwab itself evaluated the terms of those transactions according to their "spread" relative to LIBOR. *Supra* p.5-6; A867 (¶270). At this stage, those allegations must be taken as true. *See Anderson News*, 680 F.3d at 185 (in evaluating a Rule 12(b)(6) motion, a court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible").

With those allegations accepted as true, Schwab's fraud claim regarding fixed-rate instruments becomes utterly straightforward: Schwab took on interest-rate terms in fixed-rate instruments the defendants sold or issued that were too low because defendants were lying about what they (and everyone else) knew was a material consideration in pricing those instruments. The harm they caused is not much different from the harm one would cause their mortgage lender—or the

downstream purchaser of their mortgage loan—by falsely claiming a credit score of 800 when their real score was 550. In fact, defendants' fraud was much worse, because the banks were not only lying about their own credit risk, but working together to suppress the perceived credit risk associated with short-term bank debt as a whole. Because Schwab alleges that it relied on defendants' representations that LIBOR remained trustworthy, and that it was harmed in the purchase of fixed-rate instruments as a result, it states a very simple and actionable claim for fraud. *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 977 (Cal. 1997) (to demonstrate actual reliance, "[i]t is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision").

The district court concluded, however, that Schwab could not assert fraud claims based on fixed-rate instruments because they rested on "essentially a 'fraud on the market' theory" that is not permitted under the common law. SPA161-63. But this fails to take Schwab's actual allegations into account. Schwab did not allege that LIBOR suppression affected its return in fixed-rate instruments because, in a fraud-on-the-market-type sense, erroneous LIBOR information wended its way into prices of fixed-rate instruments traded in an efficient market. Instead, Schwab asserts the straightforward claim that *it individually relied* on defendants' materially false LIBOR submissions, and the resulting false LIBOR rate, when it

43

made its own decisions about buying fixed-rate instruments.  A768-70, 782, 876-79  (¶¶9-13, 58, 306-21).

Without deciding the answer, the district court also suggested it was a "close question whether plaintiffs who used LIBOR-based pricing to decide whether to invest … were within the 'class of persons' who were expected to rely on LIBOR." SPA161; *see also* Restatement (Second) of Torts §534 (stating that one who "makes a fraudulent misrepresentation intending or *with reason to expect* that more than one person … will be induced to rely on it … is subject to liability for pecuniary loss to *any one* of such persons justifiably relying") (emphasis added). But regardless whether this is a "close" question, it is a *contested* one—and so cannot be resolved in defendants' favor on a motion to dismiss.  All Schwab seeks is the opportunity to prove that defendants had "reason to expect" that fixed-rate debt purchasers like Schwab would rely on manipulated LIBOR rates in assessing and making purchases of fixed-rate instruments.  Such questions at least require discovery before they can be resolved against Schwab.

## B. The district court erred in dismissing Schwab's Exchange Act claims.

The district court's analysis of Schwab's Exchange Act claims was unsound for a very similar reason:  As with other claims, the court simply failed to take the complaint's factual allegations as true and draw all reasonable inferences in Schwab's favor.  *See Anderson News*, 680 F.3d at 185.  Instead of properly

crediting Schwab's allegations of harm due to defendants' manipulation of LIBOR, the district court resolved, in *defendants'* favor, complex questions of fact involving cause and effect in the bond market. The district court's error is further magnified by its inconsistency with that court's own determination in *LIBOR I* that defendants' fraud, as articulated by Schwab, *was* "in connection with the purchase or sale of a security." *LIBOR I*, 935 F. Supp. 2d at 726-30.

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must plead, among other things, "a connection between the misrepresentation or omission and the purchase or sale of a security" and "loss causation," *i.e.*, a connection between the alleged misstatement or omission and the ultimate loss. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). The district court found those elements lacking here. It was wrong on both counts.

Before turning to those errors, however, it is important to focus on Schwab's particular allegations. The complaint makes clear that, "when considering *whether to purchase* a fixed-rate instrument, *Plaintiffs* [*i.e.*, Schwab] evaluated the difference (or "spread") between the offered rate and LIBOR," and that a large spread "might make the offering rich, *depending on the credit risk of the issuer*." JA867 (¶270) (emphasis added). Accordingly, suppressing LIBOR did not just lead to lower interest rates, but to "lower returns" on loans to borrowers of any

given credit risk, by making "lower rates of return relatively more attractive." *Id.* And Schwab further explained that not only was this spread analysis common in the market, but "*Plaintiffs* relied on the accuracy of LIBOR in *undertaking these transactions*," *id.* (emphasis added)—a concise allegation that Schwab's individualized reliance on defendants' misrepresentations led to lower *overall returns* in connection with its *purchase or sale* of LIBOR-based instruments. Schwab made similar allegations with respect to floating-rate instruments, A866-67 (¶269), and detailed its theory of loss throughout the complaint. *See, e.g.*, A769-70, 782, 866-67 (¶¶11-12, 58, 269-70).

1.  *Schwab pled fraud "in connection with the purchase or sale of a security."*

As these allegations make clear, the district court erred in dismissing Schwab's Exchange Act claims on the ground that the alleged fraud did not occur "in connection with the purchase or sale of a security." Schwab's plain allegation is that the mix of purchase price and interest rate terms it received on borrowers of a given credit risk were materially worsened by its reliance on defendants' misrepresentations about LIBOR. That, on its face, is an allegation of fraud "in connection with" the purchase or sale of securities.

Perhaps for that reason, the district court had already correctly decided this issue in Schwab's favor before its abrupt turnabout below. In *LIBOR I*, the court dismissed Schwab's RICO claims as barred by the PSLRA's mandate that "no

46

person may rely upon any conduct that would have been actionable as fraud *in the purchase or sale of securities* to establish a violation of [the RICO Act]." *LIBOR I*, 935 F. Supp. 2d at 726 (quoting 18 U.S.C. §1964(c)). The court determined the predicate acts underlying the RICO claims—defendants' LIBOR manipulation and later sale of LIBOR-based instruments to Schwab—were precluded by the PSLRA because "the predicate acts could form the basis for a securities fraud suit by the SEC." *Id*. Although loss causation (discussed below) is not an element of an Exchange Act claim by the SEC, *id.*, the government must allege that the fraud occurred "in connection with the purchase or sale of a security." *Id.* (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)). Accordingly, the court itself expressly recognized that "the material misrepresentations or omissions in the offering materials sent to plaintiffs were clearly made in connection with the purchase or sale of securities" and that "because defendants' alleged misrepresentations to the BBA were allegedly made for the purpose of profiting unfairly from their sale of securities to plaintiffs, defendants' misrepresentations to the BBA were made 'in connection with' the sale of securities" as well. *Id.* at 729, 730. That earlier determination was clearly correct,[11] and the district court plainly

---

[11]     At a minimum, the district court's holding respecting Schwab's RICO claims was law of the case, and so should have been "adhered to by th[e] court in subsequent stages in the same case." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009). Moreover, given that defendants prevailed in dismissing Schwab's RICO claims on the theory that the alleged conduct was in connection with the purchase

erred in abandoning it to Schwab's detriment—particularly given Schwab's pleading-stage allegations to the contrary.

### 2. *Schwab plausibly pled loss causation.*

This leaves the district court's finding that Schwab's theory of loss causation—that it was harmed by the purchase of LIBOR-based instruments during the suppression period—was "illogical." SPA173. The court reasoned that, because LIBOR suppression would have driven down the purchase price of LIBOR-related securities, Schwab was actually better off in purchasing LIBOR-based instruments. *Id.*, *supra* p.17. Again, this ignored Schwab's specific pleading to the contrary. *See, e.g.*, A887-88 (¶¶375-78). To plausibly plead loss causation, Schwab merely had to allege a causal connection between the material misrepresentation and the loss sufficient to afford an "inference of economic loss." *Acticon AG v. China Ne. Petroleum Holdings Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012). And Schwab did just that, *supra* p.4-9.

The district court's contrary conclusion relies on a faulty and overly simplistic view of bond purchases. The essential assumption is that an interest rate decrease would cause a lock-step decrease in purchase price. But that is a

---

of securities, they must be judicially estopped from taking the exact opposite position when Schwab actually raises its claims as securities fraud rather than RICO fraud in a subsequent suit. *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997) ("Judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding.").

quintessential factual question, not "common economic experience" as the district court would have it, and Schwab is entitled to the contrary inference based on its pleading-stage allegation that LIBOR suppression negatively affected its overall rates of return. A866-67 (¶¶269-70). Indeed, even if LIBOR manipulation reduced the price of the security, it is entirely plausible that the reduction in the interest rate was even greater than the decrease in price. See *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016) (Buchwald, J.) ("Freddie Mac contends that it received depressed payments as a result of LIBOR suppression, and so even if it received a benefit in the purchase price of the mortgage loans, the alleged suppression could still plausibly have harmed Freddie Mac.").

Further, the district court ignored the role of risk in Schwab's evaluation and purchase of the securities: Because LIBOR manipulation masked the actual risk profile of the securities, Schwab was certainly being undercompensated for the risk it was taking, and would have insisted on higher rates if it new the truth. *See, e.g.*, Goldman Decl. ¶10; Hastings Decl. ¶7; Klingman Decl. ¶5. At an absolute minimum, Schwab has alleged that defendants' misrepresentations detrimentally skewed the balance between purchase price, credit risk, and interest rate that it received in LIBOR-based instruments, and that leads to an "inference of economic loss" sufficient to overcome a motion to dismiss. *Acticon*, 692 F.3d at 40;

49

*Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (loss causation allegations need only meet Rule 8 requirements).

### C. The district court erred in partially dismissing Schwab's unjust enrichment claims as untimely.

The same error appears again in the district court's statute-of-limitations holding on Schwab's unjust-enrichment claims.

Because it is an affirmative defense, defendants can only obtain dismissal for untimeliness if it "appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). And California law makes it very clear that the timeliness of Schwab's claims is, accordingly, another paradigm factual question that cannot be resolved against a plaintiff on a motion to dismiss. *See Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 922 (Cal. 2005) ("Resolution of the statute of limitations … is normally a question of fact."). The district court's dismissal of Schwab's unjust-enrichment claims based on inquiry notice allegedly supplied by certain *Wall Street Journal* articles accordingly cannot stand. Indeed, this Court has already held that the very newspaper articles the district court relied on below cannot suffice to support dismissal under the statute of limitations at the Rule 12(b)(6) stage. *See BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (summary order).

Here, again, Schwab's actual allegations are illustrative. Schwab devoted six full pages of its complaint to specific factual assertions about why "the Schwab

Plaintiffs had not discovered, and could not with reasonable diligence have discovered, facts indicating Defendants were knowingly" manipulating LIBOR. A856 (¶232). Those allegations included the self-concealing nature of defendants' scheme, A857 (¶234-36)—which this Court confirmed in *Gelboim*, 823 F.3d at 766—and defendants' intensive efforts to deflect concern about LIBOR by tying aberrations in the data to the unprecedented conditions of the financial crisis. A856-62 (¶¶231-55), *supra* p.10-11 (cataloguing some of defendants' statements). In the face of those detailed allegations, the district court far exceeded its pleading-stage authority in holding that Schwab necessary had inquiry notice of facts it alleged it did not know and could not have discovered.

      1.   *Schwab was not on "inquiry notice" of wrongdoing as a matter of law by May 29, 2008.*

The district court's statute-of-limitations ruling turned on its determination that news articles questioning LIBOR's accuracy that surfaced mostly in the spring of 2008 placed Schwab on "inquiry notice" of potential misconduct such that the three-year statute of limitations for unjust-enrichment claims commenced as of that date. SPA302-23. Accordingly, under the district court's analysis, Schwab's unjust-enrichment claims are barred to the extent they arose more than three years before Schwab filed its initial complaints in August 2011. But that holding runs afoul of applicable pleading rules and California law.

California provides that a cause of action accrues "when [it] is complete with all of its elements," *i.e.*, "wrongdoing, harm, and causation." *Pooshs v. Philip Morris USA, Inc.*, 250 P.3d 181, 187 (Cal. 2011). Under the "discovery rule," accrual "is postponed until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* The limitations period will begin running only after a plaintiff has "suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements." *Fox*, 110 P.3d at 919. The statute thus cannot be triggered before "the plaintiff suspects or should suspect that her injury was caused *by wrongdoing*, that someone has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 927 (Cal. 1988). At that point, the plaintiff must "conduct a reasonable investigation" and is only "charged with knowledge of the information that would have been revealed by such an investigation." *Fox*, 110 P.3d at 920. Tellingly, the presence of relevant news articles or other information in the public domain during the relevant period "does not conclusively show that a plaintiff must be imputed with knowledge." *Irving v. Lennar Corp.*, 2014 WL 68691, at *7 (E.D. Cal. Jan. 8, 2014).

The district court nonetheless determined that Schwab's claims were not "difficult for [it] to detect" by May 29, 2008 in light of certain newspaper articles raising questions about whether the banks had been making inaccurate LIBOR submissions. In arriving at that conclusion, however, the court failed to accord

Schwab the benefit of any doubt on disputed factual matters, in three critical respects.

*First*, defendants' misconduct was inherently self-concealing. The nature of the alleged wrongdoing—a collaborative, sophisticated scheme that primarily involved communications within and among the banks to further their objective—prevented a reasonable investor from discovering it. Indeed, as this Court explained in *Gelboim*, one of the core reasons the defendants would have coordinated their suppressed LIBOR submissions was that it made it much harder to detect that those submissions were not truthful. A865 (¶262); *see also Gelboim*, 823 F.3d at 766. Further, because the banks' actual borrowing costs are not publicly known, it was impossible for Schwab and other investors to determine—without sophisticated expert analysis that they had no reason at that time to consider doing—that the banks' quotes were actually false or that LIBOR was being *intentionally* suppressed. *See* A812-13 (¶¶101-104). All Schwab could have known was that something may have been off about LIBOR. That is not even sufficient to detect harm, let alone the basis for a cause of action.

Indeed, while the standards are not identical, it is noteworthy that even after the government investigations were revealed, the district court held that plaintiffs lacked sufficient facts from which to raise a pleading-stage inference of conspiracy. SPA107-121. This rock-and-a-hard-place approach to pleading

53

creates a serious risk of unfairness to deserving plaintiffs and creates a perverse incentive to file premature claims.

*Second*, and relatedly, none of the speculation that commentators and journalists expressed in 2008 concerning LIBOR manipulation developed past the level of rumor and hypothesis until the government investigations were revealed in 2011. Indeed, if Schwab was unduly credulous in 2008, so too was the Federal Reserve Bank of New York. An internal report prepared by the New York Fed in May 2008, which was publicly disclosed only after the relevant period, observed: "*Beyond the anecdotal evidence and LIBOR re-sets, it is difficult to find convincing evidence of actual misreporting*. Few public sources of data on actual Eurodollar transaction rates exist, and again, the extent of credit tiering makes it difficult to extrapolate from what data there is[.]"[12] Surely, if entities as sophisticated as the Federal Reserve were unaware of actual evidence of manipulation or fraud, investors cannot be charged with inquiry notice at the exact same time.

Further, the news articles on which the district court relied themselves suggest that the lowered LIBOR rates at that time could be the result of market dislocation resulting from the worst financial crisis to plague American markets since the Great Depression, rather than intentional manipulation. For example, the

---

[12]     Samuel Cheun & Matt Raskin*, Markets Grp., Fed. Res. Bank of N.Y., Recent Concerns Regarding LIBOR's Credibility* (May 20, 2008), *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/MarketSource_Report_May202008.pdf.

May 29, 2008 *Wall Street Journal* article titled "Study Casts Doubt on Key Rate," expressly warns that "the *Journal*'s analysis doesn't prove that banks are lying or manipulating LIBOR," and that analysts "offer various reasons why some banks might report LIBOR rates lower than what other markets indicate" in light of financial crisis conditions. A1062. The existence of those plausible, alternative explanations clearly makes Schwab's notice of defendants' malfeasance a contestable question of fact.

That is particularly so because, under settled California law, public information cannot be deemed to have placed Schwab on inquiry notice, as the complaint nowhere indicates Schwab actually saw those articles or otherwise possessed information suggesting defendants had engaged in misconduct. *See Unruh-Haxton v. Regents of the Univ. of Cal.*, 76 Cal. Rptr. 3d 146, 163 (Cal. Ct. App. 2008) ("The statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only once the plaintiff *has* a suspicion of wrongdoing") (emphasis in original). Nor, of course, could Schwab be charged in 2008 with knowledge of the facts it has since developed by employing econometric experts to scrutinize the data in light of the revealed government investigations. A862-65 (¶¶256-62). *See, e.g.*, *In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *13 (N.D. Cal. May 16, 2011) (newspaper articles insufficient to create inquiry notice); *Int'l Union of*

*Operating Eng'rs v. Bank of N.Y. Mellon Corp.*, 2012 WL476526, at \*7-8 (N.D. Cal. Feb. 14, 2012) (California claims not time-barred where plaintiff contended "it was unaware of defendants' 'deceptive practices' until the recent unsealing of several whistleblower complaints"). In short, the publicly available information in this case falls well short of California's inquiry-notice threshold.

*Third*, even accepting that the 2008 articles could have indicated to a reasonable investor that LIBOR was being manipulated, defendants' numerous denials and coordinated PR counter-offensive fatally undermine the district court's dismissal. *See supra* p.10-11; A858-62 (¶¶237-55). This Court has recognized "[t]here are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management." *LC Capital Partners v. Frontier Ins. Grp, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003). Reassuring statements "will prevent the emergence of a duty to inquire or dissipate such a duty" where an investor of ordinary intelligence "would reasonably rely on the statements to allay the investor's concern." *Id.* That principle applies here. Defendants' and the BBA's statements were not "mere expressions of hope," *id.*, but rather specific representations of purported fact on which reasonable investors could rely. *See supra* p.10-11; *In re Ambac Fin. Grp., Inc., Sec. Litig.*, 693 F. Supp. 2d 241, 276 (S.D.N.Y. 2010) (Buchwald, J.) (denying motion to dismiss on

56

statute-of-limitations grounds where plaintiffs alleged "numerous statements of comfort by Ambac officers who sought to alleviate investor concerns about these supposed storm warnings").

The district court erred in determining that "a person of ordinary intelligence would have understood the banks' and the BBA's strong incentives to deny manipulating LIBOR" and that plaintiffs thus "should have regarded such assurances cautiously, if at all, and should not have forgone a reasonable investigation of public data on the basis of such self-serving statements." SPA276-77. This is, once again, the kind of context-specific factual finding that cannot possibly be resolved against Schwab—and the detailed, contrary allegations of Schwab's complaint—at the pleading stage. As this Court made clear in *LC Capital*, 318 F.3d at 155, "whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated" depends on myriad factors, and defendants' reassurances thus cannot be dismissed simply because defendants have a motive to deflect blame (since, of course, they always will). Accordingly, whether Schwab's claims are timely will turn on fact-sensitive assessments regarding, among other things, the context in which those reassuring statements were made and the extent to which (if at all) investors and other market participants reacted to them. In particular, the plausible cover that was provided here by the unprecedented conditions of the financial crisis cannot be dismissed;

given the distress throughout the financial sector, Schwab would certainly have had reason to believe that LIBOR aberrations were attributable to unusual market conditions rather than a shocking level of malfeasance among LIBOR panel banks. The district court was wrong to preempt such purely factual questions at the pleading stage.

Indeed, the district court's ruling is directly at odds with this Court's order vacating the dismissal of a LIBOR-related case based on *the same set of news articles relied on below*. In *BPP Illinois, LLC v. Royal Bank of Scotland Group, PLC*, 2013 WL 6003701 (S.D.N.Y. Nov. 13, 2013), the district court dismissed certain plaintiffs' claims as time-barred, agreeing with defendants that plaintiffs "had to file their claims within two years of May 29, 2008, when reports and news articles about the manipulation of LIBOR put them on notice of their potential claims." *Id.* at *4. The court also rejected plaintiffs' argument that reassuring statements by defendants and the BBA rendered their claims timely because such statements were insufficient in the face of the relevant articles. But this Court reversed, holding that the lower court "acted too hastily" in dismissing on statute-of-limitations grounds at the pleading stage. *BPP Ill.*, 603 F. App'x at 59. Because, as this Court explained, a plaintiff "is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense," requiring the BPP

plaintiffs to make a showing of reasonable diligence "was premature." *Id.* That reasoning applies equally here.

In short, Schwab's timeliness allegations were yet another category of matters that the district court should not have reached to resolve at the pleading stage. Instead, Schwab's unjust-enrichment claims should proceed, in full, to discovery.

### D. The district court erred in holding that Schwab failed to state a civil conspiracy theory of relief under California law.

Finally, *Gelboim* demands reversal of the district court's determination that Schwab failed to state a theory of relief under California law that was grounded on defendants' conspiracy to suppress LIBOR. As discussed earlier, California law holds conspirators liable for their co-conspirators' acts. *Applied Equip.*, 869 P.2d at 459. Relying on its determination that Schwab failed to plausibly allege a conspiracy, the court held that Schwab could not succeed on a conspiracy-based theory of joint liability. *Gelboim* fatally undermines that ruling, as we doubt even defendants will dispute. C*ompare* SPA107-21, *with* 823 F.3d at 781-82.

This, however, is yet another example of the district court's willingness to take the record in the light most favorable to the *defendants*—the opposite of what the law requires. The simple reality is that the existence of defendants' conspiracy was *clearly* a contested factual question that—like the many others discussed above—required factual development through discovery, not pleading-stage

resolution by the court.  Schwab must be allowed to develop evidence and attempt to prove to a jury that a conspiracy existed and that liability for any state-law torts should thus, as California law permits, be spread to all of the conspirators.  And it should have that same right with respect to all of the claims addressed above.

## CONCLUSION

The judgment below should be reversed and the case remanded for further proceedings.


Dated:  New York, New York
      October 14, 2016

Respectfully Submitted,

/s/Thomas C. Goldstein
Thomas C. Goldstein
Eric F. Citron
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Telephone:  (202) 362-0636
tg@goldsteinrussell.com
ecitron@goldsteinrussell.com

Steven E. Fineman
Michael J. Miarmi
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
sfineman@lchb.com
mmiarmi@lchb.com

Brendan P. Glackin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
bglackin@lchb.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certify that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because exclusive of the exempted portions it contains 13,960 words as counted by the word-processing program used to prepare the brief; and

2.  The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2013 in a proportionately spaced typeface: Times New Roman, font size 14.


Dated: October 14, 2016                          /s/ Thomas C. Goldstein
                                                 Thomas C. Goldstein

## CERTIFICATE OF SERVICE

I, Thomas C. Goldstein, hereby certify that I served a copy of the foregoing brief on all parties on October 14, 2016 through the Court's CM/ECF system. Counsel for all parties are registered users of that system.

/s/Thomas C. Goldstein
Thomas C. Goldstein