# 16-1189-cv

## United States Court of Appeals
### *for the*
## Second Circuit

CHARLES SCHWAB CORPORATION, CHARLES SCHWAB BANK, N.A.,
CHARLES SCHWAB & CO., INC., SCHWAB SHORT-TERM BOND
MARKET FUND, SCHWAB TOTAL BOND MARKET FUND, SCHWAB U.S.
DOLLAR LIQUID ASSETS FUND, SCHWAB MONEY MARKET FUND,
SCHWAB VALUE ADVANTAGE MONEY FUND, SCHWAB RETIREMENT
ADVANTAGE MONEY FUND, SCHWAB INVESTOR MONEY FUND,
SCHWAB CASH RESERVES, SCHWAB ADVISOR CASH RESERVES,
SCHWAB YIELDPLUS FUND, SCHWAB YIELDPLUS FUND
LIQUIDATION TRUST,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

STEVEN E. FINEMAN
MICHAEL J. MIARMI
LIEFF, CABRASER, HEIMANN
  &amp; BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

THOMAS C. GOLDSTEIN
ERIC F. CITRON
CHARLES H. DAVIS
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
(202) 362-0636

RICHARD M. HEIMANN
BRENDAN P. GLACKIN
LIEFF, CABRASER, HEIMANN
  &amp; BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-1000
*Attorneys for Plaintiffs-Appellants*

FTC CAPITAL GMBH, FTC FUTURES FUND PCC LTD, FTC FUTURES
FUND SICAV, CARPENTERS PENSION FUND OF WEST VIRGINIA, CITY
OF DANIA BEACH POLICE & FIREFIGHTERS' RETIREMENT SYSTEM,
RAVAN INVESTMENTS, LLC, MAYOR AND CITY COUNCIL OF
BALTIMORE, RICHARD HERSHEY, JEFFREY LAYDON, METZLER
INVESTMENT GMBH, ROBERTO CALLE GRACEY, CITY OF NEW
BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, AVP
PROPERTIES, LLC, 303030 TRADING LLC, ELLEN GELBOIM, ATLANTIC
TRADING USA, LLC, COMMUNITY BANK & TRUST, THE BERKSHIRE
BANK, ELIZABETH LIEBERMAN, 33-35 GREEN POND ROAD
ASSOCIATES, LLC, TODD AUGENBAUM, GARY FRANCIS, NATHANIEL
HAYNES, COURTYARD AT AMWELL II, LLC, GREENWICH COMMONS
II, LLC, JILL COURT ASSOCIATES II, LLC, MAIDENCREEK VENTURES II
LP, RARITAN COMMONS, LLC, LAWRENCE W. GARDNER, ANNIE BELL
ADAMS, DENNIS PAUL FOBES, LEIGH E. FOBES, GOVERNMENT
DEVELOPMENT BANK FOR PUERTO RICO, MARGARET LAMBERT,
DIRECORS FINANCIAL GROUP, BETTY L. GUNTER, DIRECT ACTION
PLAINTIFFS, CARL A. PAYNE, KENNETH W. COKER, CITY OF
RIVERSIDE, THE RIVERSIDE PUBLIC FINANCING AUTHORITY, EAST
BAY MUNICIPAL UTILITY DISTRICT, COUNTY OF SAN MATEO, SAN
MATEO COUTY JOINT POWERS FINANCING AUTHORITY, CITY OF
RICHMOND, THE RICHMOND JOINT POWERS FINANCING AUTHORITY,
Successor Agency to the Richmond Community Redevelopment Agency,
COUNTY OF SAN DIEGO, GUARANTY BANK & TRUST COMPANY,
HEATHER M. EARLE, HENRYK MALINOWSKI, LINDA CARR, ERIC
FRIEDMAN, COUNTY OF RIVERSIDE, JERRY WEGLARZ, NATHAN
WEGLARZ, SEIU PENSION PLANS MASTER TRUST, HIGHLANDER
REALTY, LLC, JEFFREY D. BUCKLEY, THE FEDERAL HOME LOAN
MORTGAGE CORPORATION, COUNTY OF SONOMA, DAVID E.
SUNDSTROM, in his official capacity as Treasurer of the County of Sonoma for
and on behalf of the Sonoma County Tresury Pool Investment, THE REGENTS
OF THE UNIVERSITY OF CALIFORNIA, SAN DIEGO ASSOCIATION OF
GOVERNMENTS, CEMA JOINT VENTURE, COUNTY OF SACRAMENTO,
THE CITY OF PHILADELPHIA, THE PENNSYLVANIA
INTERGOVERNMENTAL COOPERATION AUTHORITY, PRINCIPAL
FUNDS, INC., PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND
MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI
DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI
GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH
QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND
I, PFI INCOME FUND, PFI INFLATION PROTECTION FUND, PFI SHORT-
TERM INCOME FUND, PFI MONEY MARKET FUND, PFI PREFERRED
SECURITIES FUND, PRINCIPAL VARIABLE CONTRACTS FUNDS, INC.,
PVC ASSET ALLOCATION ACCOUNT, PVC MONEY MARKET
ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE
SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC
GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME
ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL
FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC.,

PRINCIPAL LIFE INSURANCE COMPANY, PRINCIPAL CAPITAL
INTEREST ONLY I, LLC, PRINCIPAL COMMERCIAL FUNDING, LLC,
PRINCIPAL COMMERCIAL FUNDING II, LLC, PRINCIPAL REAL ESTATE
INVESTORS, LLC, TEXAS COMPETITIVE ELECTRIC HOLDINGS
COMPANY LLC, NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal Credit Union, WESTERN
CORPORATE FEDERAL CREDIT UNION, MEMBERS UNITED
CORPORATE FEDERAL CREDIT UNION, SOUTHWEST CORPORATE
FEDERAL CREDIT UNION, and CONSTITUTION CORPORATE FEDERAL
CREDIT UNION, FEDERAL NATIONAL MORTGAGE ASSOCIATION,
DARBY FINANCIAL PRODUCTS, CAPITAL VENTURES
INTERNATIONAL, BAY AREA TOLL AUTHORITY, PRUDENTIAL
INVESTMENT PORTFOLIOS 2, on behalf of Prodential Core Short-Term Bond
Fund, PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, TRIAXX
PRIME CDO 2006-1, LTD., TRIAXX PRIME CDO 2006-2, LTD., TRIAXX
PRIME CDO 2007-1, LTD., THE FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver, DIRECT ACTION PLAINTIFF, DIRECT
ACTION PLAINTIFFS, SALIX CAPITAL US INC., FRAN P. GOLDSLEGER,
JOSEPH AMABILE, LOUIE AMABILE, NORMAN BYSTER, MICHAEL
CAHILL, RICHARD DEOGRACIAS, MARC FEDERIGHI, SCOTT
FEDERIGHI, ROBERT FURLONG, DAVID GOUGH, BRIAN HAGGERTY,
DAVID KLUSENDORF, RONALD KRUG, CHRISTOPHER LANG, JOHN
MONCKTON, PHILIP OLSON, BRETT PANKAU, DAVID VECCHIONE,
RANDALL WILLIAMS, EDUARDO RESTANI, NICHOLAS PESA, JOHN
HENDERSON, 303 PROPRIETARY TRADING LLC, MARGERY TELLER,
CALIFORNIA PUBLIC PLAINTIFFS, NATIONAL ASBESTOS WORKERS
PENSION FUND, PENSION TRUST FOR OPERATING ENGINEERS,
HAWAII ANNUITY TRUST FUND FOR OPERATING ENGINEERS,
CEMENT MASONS' INTERNATIONAL ASSOCIATION EMPLOYEES'
TRUST FUND, AXIOM INVESTMENT ADVISORS, LLC, AXIOM HFT LLC,
AXIOM INVESTMENT ADVISORS HOLDINGS L.P., AXIOM
INVESTMENT COMPANY, LLC, AXION INVESTMENT COMPANY
HOLDINGS L.P., AXIOM FX INVESTMENT FUND, L.P., AXIOM FX
INVESTMENT FUND II, L.P., AXIOM FX INVESTMENT 2X FUND, L.P.,
EPHRAIM F. GILDOR, GILDOR FAMILY ADVISORS L.P., GILDOR
FAMILY COMPANY L.P., GILDOR MANAGEMENT, LLC, CITY OF
PHILADELPHIA, PENNSYLVANIA INTERGOVERNMENTAL
COOPERATION AUTHORITY, CITY OF NEW BRITAIN, LINDA ZACHER,

*Plaintiffs,*

– v. –

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BANK
OF TOKYO-MITSUBISHI UFJ, LTD., BARCLAYS BANK PLC, CITIGROUP
INC., CITIBANK, N.A., COOPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., CREDIT SUISSE GROUP AG, DEUTSCHE
BANK AG, HSBC HOLDINGS PLC, HSBC BANK PLC, JPMORGAN CHASE
& CO., JPMORGAN CHASE BANK, N.A., LLOYDS BANKING GROUP PLC,
HBOS PLC, ROYAL BANK OF CANADA, THE NORINCHUKIN BANK,
THE ROYAL BANK OF SCOTLAND GROUP PLC, UBS AG, PORTIGON
AG, fka WestLB AG, WESTDEUTSCHE IMMOBILIENBANK AG,

*Defendants-Appellees,*

RABOBANK GROUP, CREDIT SUISSE GROUP, NA, SOCIETE GENERALE, DEUTSCHE BANK FINANCIAL LLC, DEUTSCHE BANK SECURITIES INCORPORATED, BARCLAYS CAPITAL INC., BARCLAYS U.S. FUNDING LLC, CREDIT SUISSE SECURITIES (USA) LLC, BANK OF AMERICA SECURITIES LLC, J.P. MORGAN CLEARING CORP., HSBC SECURITIES (USA) INC., UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., NATIONAL ASSOCIATION, BANK OF NOVA SCOTIA, BNP PARIBAS S.A., CREDIT ARGICOLE, S.A., SUMITOMO MITSUI BANKING CORPORATION, BARCLAYS PLC, WESTLB AG, CHASE BANK USA, N.A., ROYAL BANK OF SCOTLAND, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, CITIZENS BANK OF MASSACHUSETTS, Agent of RBS Citizens Bank, NA, RBS CITIZENS, N.A., (f/k/a Citizens Bank of Massachusetts) incorrectly sued as othe Charter One Bank NA, STEPHANIE NAGEL, BRITISH BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD, BBA LIBOR, LTD, CREDIT SUISSE INTERNATIONAL, HSBC BANK USA, N.A., LLOYDS TSB BANK PLC, J.P. MORGAN BANK DUBLIN PLC, formerly known as Bear Stearns Bank PLC, UBS LIMITED, CITIGROUP FINANCIAL PRODUCTS, INC., ICAP PLC, CREDIT SUISSE AG, CREDIT SUISSE (USA), INC., THE HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., J.P. MORGAN MARKETS LTD., LLOYDS BANK PLC, (formerly known as Lloyds TSB Bank PLC), RBC CAPITAL MARKETS, LLC, BANK OF AMERICA HOME LOANS, CITI SWAPCO INC., J.P. MORGAN SECURITIES, LLC, MERRILL LYNCH CAPITAL SERVICES, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, RBS SECURITIES INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP FUNDING, INC., HSBC FINANCE CORPORATION, HSBC USA, INC., MERRILL LYNCH & CO., INC., MERRILL LYNCH INTERNATIONAL BANK, LTD., BEAR STEARNS CAPITAL MARKETS, INC., CITIZENS BANK N.A., CREDIT SUISSE SECURITIES (USA) INC., BARCLAYS CAPITAL (CAYMAN) LIMITED, SOCIETE GENERALE, S.A.,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ............................................................ ii

REPLY ............................................................................ 1

ARGUMENT ......................................................................... 4

  I.  Schwab Makes A *Prima Facie* Showing Of Personal Jurisdiction ................ 4

    A.  Defendants' new challenges to the specificity of Schwab's complaint are both waived and unavailing. ............................................... 4

    B.  Sales in California suffice for personal jurisdiction there. ......................... 8

    C.  Defendants' broker-dealer arguments are waived and incorrect. ............ 17

    D.  Personal jurisdiction extends to the non-selling defendants through their conspiracy. ................................................................... 19

  II.  The District Court Erroneously Dismissed Several Claims On The Merits. .. ........................................................................ 24

    A.  Schwab plausibly alleges common-law fraud for transactions in fixed-rate instruments, as well as securities fraud. ................................... 25

    B.  Schwab's unjust-enrichment claims are not partially time-barred. ......... 30

CONCLUSION ....................................................................... 32

CERTIFICATE OF COMPLIANCE ...................................................... 34

CERTIFICATE OF SERVICE .......................................................... 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allianz Ins. Co. v. Lerner*,
  416 F.3d 109 (2d Cir. 2005) ................................................................5

*April Enters., Inc. v. KTTV*,
  195 Cal. Rptr. 421 (Ct. App. 1983) ...................................................31

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d Cir. 2002) ..............................................................13

*BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*,
  603 F. App'x 57 (2d Cir. 2015) .........................................................30

*BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*,
  No. 13-CV-0638, 2013 WL 6003701 (S.D.N.Y. Nov. 13, 2013) ......................30

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)............................................................ 1, 17, 23

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002) ................................................................4

*Chadbourne & Parke LLP v. Troice*,
  134 S. Ct. 1058 (2014)......................................................................27

*Chew v. Dietrich*,
  143 F.3d 24 (2d Cir. 1998) ................................................................13

*Chloé v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010) ........................................................ 14, 15

*Chrysler Capital Corp. v. Century Power Corp.*,
  778 F. Supp. 1260 (S.D.N.Y. 1991) ..................................................20

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
 637 F.3d 169 (2d Cir. 2011) ...............................................................29

*CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*,
 589 F.3d 235 (6th Cir. 2009) ..............................................................32

*EMI Christian Music Grp. v. MP3tunes*, LLC,
 844 F.3d 79 (2d Cir. 2016) .................................................................15

*FDIC v. Dintino*,
 84 Cal. Rptr. 3d 38 (Ct. App. 2008) ...................................................31

*Gelboim v. Bank of America Corp. (Gelboim II)*,
 823 F.3d 759 (2d Cir. 2016) ..................................................... 2, 12, 23

*In re Coudert Bros.*,
 809 F.3d 94 (2d Cir. 2015) .................................................................12

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR I*),
 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................5, 9

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VI*),
 No. 11-MDL-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) .....................7

*In re Terrorist Attacks on Sept. 11, 2001*,
 349 F. Supp. 2d 765 (S.D.N.Y. 2005) .................................................20

*Keeton v. Hustler Magazine*,
 465 U.S. 770 (1984).......................................................... 1, 7, 17, 18

*Kernan v. Kurz-Hastings, Inc.*,
 175 F.3d 236 (2d Cir. 1999) ...............................................................15

*Leasco Data Processing Equip. v. Maxwell*,
 468 F.2d 1326 (2d Cir. 1972) ....................................................... 20, 21

*Merck & Co. v. Reynolds*,
 559 U.S. 633 (2010)............................................................................29

iii

*Oliver Schs., Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991) ....................................................................6

*Textor v. Bd. of Regents of N. Ill. Univ.*,
    711 F.2d 1387 (7th Cir. 1983) ..............................................................20

*United States v. Maruyasu Indus. Co.*,
    No. 1:16-CR-64, 2017 WL 228221 (S.D. Ohio Jan. 19, 2017)..........................22

*United States v. Punn*,
    737 F.3d 1 (2d Cir. 2013) ....................................................................16

*United States v. Restrepo*,
    986 F.2d 1462 (2d Cir. 1993) ..........................................................6, 26

*Unspam Technologies v. Chernuk*,
    716 F.3d 322 (4th Cir. 2013) ..............................................................21

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ................................................................ 16, 23

*Waldman v. Palestinian Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ..............................................................16

*Wood v. Milyard*,
    132 S. Ct. 1826 (2012)........................................................................4

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)......................................................................1, 23

## Statutes

28 U.S.C. § 1658(b)(1)....................................................................29

Cal. Code Civ. P. § 338(d)..............................................................31

**Other Authorities**

U.S. Response to Motion to Dismiss, *United States v. Maruyasu Indus. Co.*, No. 1:16-CR-64, 2017 WL 228221 (S.D. Ohio filed Sept. 13, 2016) (ECF No. 50)...... ................................................................................................................. 22, 23

## REPLY

To prevail, defendants must defend a radical proposition. On their view, conspiring to manipulate U.S. Dollar LIBOR is insufficient to allow them to be haled into any U.S. forum, including a forum in which *they sold* their manipulated, LIBOR-based financial products to an injured plaintiff. In fact, defendants believe that is true whether those in-forum sales were by their co-conspirators, by their wholly-owned and controlled subsidiaries, or even by defendants themselves. This proposition is plainly indefensible: It runs headlong into settled precedent holding that a defendant is subject to personal jurisdiction where it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State and those products subsequently injure forum consumers." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985); *see Keeton v. Hustler Magazine*, 465 U.S. 770, 780-81 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980). Further, a decision by this Court rejecting jurisdiction over all the defendants despite of their participation in a conspiracy directed at California (and elsewhere) would conflict with rulings by every court of appeals to consider the issue, and throw into doubt a theory even the federal government relies upon to reach foreign fraudsters and price-fixing cartels that deliberately harm American consumers. *Infra* p.19-24.

To avoid facing down this illustratively extreme result, defendants try various dodges. But those are illustrative in their own right. Their frontline argument criticizes Schwab's complaint for failing to provide defendant-by-defendant or transaction-by-transaction details regarding personal jurisdiction, even though defendants never demanded such details or sought dismissal on this ground below. *Infra* p.4-17. And they repeat the same error when it comes to the connections between defendants and their broker-dealer subsidiaries—even though they admit Schwab alleges the parent-defendants' complete ownership and control. *Infra* p.17-19. These waived arguments are telling: Below, defendants sought and obtained dismissal on the ground that *no* defendant could be sued in California because the alleged submission of false LIBOR quotes occurred in London, and they said nothing about the particularity of Schwab's allegations with respect to jurisdiction. *See* SPA65-74, 91-95. Now, they blame Schwab for their own all-or-nothing approach.

Defendants also critically rely on an argument this Court has already rejected. In *Gelboim v. Bank of America Corp. (Gelboim II)*, 823 F.3d 759, 780-82 (2d Cir. 2016), this Court abrogated part of the decision below and held that plaintiffs had adequately alleged a conspiracy among defendants to make money on LIBOR-related instruments by manipulating LIBOR. The absence of such a conspiracy was a lynchpin holding of the decision on review. SPA69-71. But

2

defendants nonetheless persist in contesting this same question about the alleged purpose of their conspiracy, having somehow convinced the district court to directly violate this Court's mandate and reconsider the issue for itself a second time at the same pleading stage. *Infra* p.11-13. It's clear why defendants lean so heavily on this troubling violation of the mandate rule: This Court's conclusion that defendants' LIBOR-manipulation conspiracy was directed to increased profits on LIBOR-based instruments makes it utterly clear that defendants' sales of LIBOR-based instruments necessarily "relate to" Schwab's claims about LIBOR-manipulation—all the law requires. Indeed, the cases in which this Court has allowed personal jurisdiction involve claims that "relate to" defendants' in-forum conduct far less directly than Schwab's claims here, *infra* p.13-17, as defendants revealingly admit in urging this Court to coin a brand new test based on isolated dicta, *id*.

The district court's rulings on the substance of Schwab's claims fare no better. The court repeatedly failed to take Schwab's allegations as pleaded, afforded defendants the benefit of contested inferences, and resolved against Schwab factual issues not suited for the pleading stage. Defendants must do the same here to defend the district court's results. So here, again, defendants must propose untenable, alternative grounds for affirmance that are contrary either to determinations this Court has already made in related LIBOR-fixing cases or to

3

allegations admittedly found in the complaint. *See infra* p. 24-31. This Court should reverse in all respects.

## ARGUMENT

### I.    Schwab Makes A *Prima Facie* Showing Of Personal Jurisdiction.

#### A. Defendants' new challenges to the specificity of Schwab's complaint are both waived and unavailing.

Defendants concede (at 20, 29) that, according to the complaint, five defendants sold LIBOR-based financial instruments to Schwab in California, and five others did so through affiliated broker-dealers working at the direction and for the benefit of the defendant parent corporations. *See* A867-68 (¶¶272-75). Nonetheless, they argue (at 19-21) that these allegations are not individualized enough regarding each defendant's contacts with California, making the required personal-jurisdiction analysis "impossible." While that argument is belied by Schwab's actual allegations, *infra* p.7-8, it is also waived for failure to raise it below. *See* SDNY Dkt. #11-md-2262, Doc. 754 (Nov. 5, 2014), at 9-20 (nowhere advancing that argument); SDNY Dkt. #11-md-2262, Doc. 922 (Dec. 23, 2014), at 5-13 (same).

"For good reason, appellate courts ordinarily abstain from entertaining issues that have not been raised and preserved in the court of first instance." *Wood v. Milyard*, 132 S. Ct. 1826, 1834 (2012); *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 327 (2d Cir. 2002). And because defendants offer no excuse for failing

to raise the argument below, this Court need go no further. *See Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) (declining to consider "untimely arguments," where "[d]efendants proffer[ed] no reason for their failure to raise the arguments below").

Moreover, any concerns about the specificity of Schwab's allegations are of defendants' making. As Schwab's opening brief explains (at 40), defendants failed to contest specific personal jurisdiction in their briefing leading up to the district court's decision on their first motions to dismiss, *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR I*), 935 F. Supp. 2d 666 (S.D.N.Y. 2013), which indicates they believed Schwab's April 2012 complaint presented sufficient information. After defendants received a favorable merits ruling and the district court declined supplemental jurisdiction over Schwab's common-law claims in *LIBOR I*, Schwab re-filed this complaint in state court—providing essentially identical details. Schwab's operative amended complaint, filed in October 2014, offers even greater detail regarding Schwab's transactions with defendants and their broker-dealer subsidiaries. A866-75 (¶¶268-300). Having failed to contest issues of particularity below, and having failed to contest personal jurisdiction *at all* with respect to functionally identical allegations, it is far too late now for defendants to start complaining about Schwab's level of detail.

That is particularly so because an absence of such details is easily cured by amendment—a right liberally granted in such circumstances. *See Oliver Schs., Inc. v. Foley*, 930 F.2d 248, 252 (2d Cir. 1991) ("To the extent that the court felt it would be unfair to require the defendants to respond to a complaint that did not more precisely state the basis for the claims against them …, the court should at least have granted [plaintiff] leave to amend the complaint to provide greater specificity."). Raising this argument for the first time on appeal frustrates that right.

Defendants' procedural gamesmanship also lacks any underlying substance. Schwab's declarations associated with defendants' motion to dismiss its antitrust claims demonstrate that Schwab could easily allege additional facts supporting jurisdiction with even greater particularity. *See* Opening Br. 6, 23, 25, 26, 31, 49; SDNY Dkt. #11-md-2262, Docs. 1512 (Goldman Decl.), 1513 (Hastings Decl.), 1514 (Klingman Decl.). Defendants don't even contest the facts alleged in these attestations; all they do is contest their admissibility in a footnote (at 11 n.3). To the extent a footnote is even sufficient to raise this argument, *see United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) (arguments in footnotes "not adequately raised or preserved for appellate review"), defendants are trying to have it both ways: They themselves rely extensively (at 9-10, 27, 34-36) on the district court's recent holdings in *In re LIBOR-Based Financial Instruments Antitrust*

6

Litigation (*LIBOR VI*), No. 11-md-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016), negating any claimed unfairness in Schwab citing to the record of that decision here.

Defendants' entire "specificity" argument also relies on a pleading rule of their own invention. They repeatedly cite *Keeton*, 465 U.S. at 781 n.13, for the proposition that "[e]ach defendant's contacts with the forum must be assessed individually," but this statement merely repeats the uncontroversial proposition that the court must perform a due process analysis on all defendants, not that there is some sort of "undifferentiated pleading standard." Appellees Br. 21. *Keeton* also remanded for further analysis—it did not dismiss those defendants outright, as defendants here imply. Defendants cite no case announcing a specificity standard for personal-jurisdiction pleadings and, more importantly, identify no case in which *all* the defendants were dismissed because a complaint that was adequate as to some failed to address *each* defendant in superfluous detail.

In any event, Schwab's complaint provides details that easily suffice to enable the relevant jurisdictional inquiry. As defendants acknowledge (at 20-21, 29), it separately identifies those who sold Schwab LIBOR-based instruments in California, and specifies for each Schwab plaintiff whether those sales were made directly by a defendant or through defendants' wholly-owned, broker-dealer subsidiaries. *See* A868 (¶¶273, 274). The complaint also specifically alleges that

defendants solicited Schwab *in California* and/or sold the relevant LIBOR-based financial instruments to Schwab there. *See, e.g.*, A773 (¶21) ("Defendants offered, issued, and/or sold, or controlled individuals or entities that offered, issued, and/or sold, LIBOR-based financial instruments to the Schwab Plaintiffs" in California, and "all of the Schwab Plaintiffs' purchases of LIBOR-based financial instruments during the Relevant Period were made through Schwab's trading desk in San Francisco"); A868-75 (¶¶268-300) (detailing Schwab's transactions in financial instruments issued and/or sold by defendants or their broker-dealer subsidiaries); *see also* Goldman Decl. ¶¶1-6; Hastings Decl. ¶¶1-4; Klingman Decl. ¶¶1-4.

This information was more than adequate for the district court to assess California's personal jurisdiction for all defendants below; having ruled on the issue, it clearly didn't find the analysis "impossible." Instead, it rooted its decision not in a lack of specificity, but in the conclusion that sales of manipulated LIBOR-based products to Schwab in California were insufficient to create California jurisdiction for Schwab's claims of LIBOR manipulation. That radical conclusion is what defendants must defend.

## B. Sales in California suffice for personal jurisdiction there.

On that issue, defendants face two separate hurdles. First, defendants recognize (at 22-23 & n.7) that California has personal jurisdiction over any cause of action arising from California sales, but argue (incorrectly) that the district court

8

dismissed all such causes of action. Second, defendants argue (incorrectly) that California sales are not sufficiently "related to" the fraud claim Schwab undisputedly retains regarding defendants' fraudulent LIBOR-setting submissions. This Court can reverse on either ground.

*First*, defendants incorrectly assert (at 23) that the district court dismissed on the merits any claim for fraud based on failure to disclose LIBOR manipulation when selling LIBOR-based products. The court said the opposite, upholding fraud claims based on a counterparty's "duty to disclose facts when it knows that the other party is mistaken as to facts that are basic to the transaction and when the customs of the trade or other objective circumstances would reasonably demand disclosure" (*i.e.*, a "special facts" or "superior knowledge" principle). SPA142. While the court's opinion later expressly refers to swap transactions, its reasoning applies equally to fraud claims against defendant-counterparties in bond transactions. Indeed, the court observed that "[a]lmost every plaintiff submits that their counterparties committed fraud by failing to inform plaintiffs of LIBOR manipulation" and determined that "[m]ost plaintiffs' attempts to plead omissions on a 'special facts' or 'superior knowledge' theory are sufficient." SPA141-43. This is consistent with the district court's earlier, *Schwab-specific* ruling that such omissions could give rise to claims for securities fraud. *LIBOR I*, 935 F. Supp. 2d at 728 ("Fairly read, these allegations plainly indicate that defendants made

9

misleading statements to plaintiffs, likely in the offering materials themselves but, at any rate, certainly 'in connection with' defendants' sale of LIBOR-based securities to plaintiffs.").

Defendants also contend (at 27) that because Schwab's case includes purchases of instruments from non-defendants (among many billions of dollars in subject transactions), Schwab's theory of fraud must be "agnostic" about who made the sales and where. That is incorrect. This was *defendants' motion to dismiss*; if they believed different kinds of claims about different transactions were different for jurisdictional purposes, they were required to make that argument below so Schwab could respond or amend as necessary. *Supra* p.4-6. Put otherwise, lack of personal jurisdiction is a *defense*, and it is that *defense* that has been "agnostic" among defendants and transaction types. The complaint facilitates disaggregation by describing subsets of transactions, A867-68 (¶¶272-75), and yet defendants chose not to go that route, relying instead on the longshot argument that, because they manipulated LIBOR in London, personal jurisdiction is unavailable in California for any claim. Because that argument clearly fails, reversal is required.

Separately, defendants ignore Schwab's surviving *non-fraud* claims arising directly from California sales. *See, e.g.*, A884 (¶¶359-60) (alleging that "[b]y means of their unlawful conduct … [defendants] knowingly acted in an unfair,

10

unconscionable, and oppressive manner toward Plaintiffs" and "knowingly received and retained wrongful benefits and funds from Plaintiffs"). In addition to breach of the implied covenant of good faith and fair dealing as well as unjust enrichment, those claims also expressly include tortious interference with contracts "against panel banks as to bonds issued by corporate affiliates." SPA205; A881 (¶¶334-39). These claims alone—the merits of which defendants do not challenge on appeal—plainly require reversal.

*Second*, even assuming away this primary error, defendants are wrong that sales of financial instruments affected by LIBOR manipulation in California don't "relate to" Schwab's claims for LIBOR manipulation generally. In making this argument, defendants (1) rely on a district-court holding this Court has already rejected; (2) misstate the relevant test; and (3) would lose anyway.

1. To begin, defendants' suggestion (at 27) that sales in California are not "suit-related" conduct ultimately relies (as defendants concede) on the district court's conclusion below and in *LIBOR VI* that defendants' only "wrongful effort" here was to "project[] … financial soundness," and not to make money by selling plaintiffs products tainted by defendants' fraudulent price-fixing and LIBOR manipulation. Appellees Br. 9-10, 27, 34-35 (repeatedly invoking this holding from *LIBOR VI*). Of course, if the latter "wrongful effort" existed as well, then selling the products in California is obviously "suit-related," because offering

11

financial products with artificially suppressed interest rates is what renders defendants' misconduct profitable in the first place.

Defendants' reliance on the district court's myopic view of "suit-related" conduct is fatal because this Court already held in *Gelboim II*, however, that one plausibly alleged goal of defendants' conspiracy was to earn profits by manipulating LIBOR. 823 F.3d at 781-82. Defendants suggest (without explanation) that *LIBOR VI* is somehow "consistent with" this Court's analysis in *Gelboim II*, but that position is inexplicable. The district court below disregarded this Court's mandate in rejecting an alleged conspiracy to earn profits through LIBOR manipulation: This Court expressly called for record development on that point, *id.* at 782, and the district court nonetheless dismissed *again* at the Rule 12(b)(6) stage—even though class-certification discovery had only just commenced. *See In re Coudert Bros.*, 809 F.3d 94, 98 (2d Cir. 2015) ("The lower court cannot vary [the mandate], or examine it for any other purpose than execution … or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it." (internal quotation marks omitted)). As defendants recognize (at 10), *LIBOR VI* followed the decision below in relying on this already-identified error to render "sales of LIBOR-based instruments … immaterial to the jurisdictional analysis."

Separating defendants' profit motive from their effort to "project[] …
financial soundness" during the financial crisis is also illogical. Banks do not
project soundness for its own sake: Financial soundness affects borrowing rates,
and if the banks had not concealed their instability, their LIBOR-based instruments
would obviously have required much higher rates to find willing counterparties.
Sales of the suppressed LIBOR-based instruments in California thus plainly relate
to defendants' LIBOR-manipulation scheme, even assuming its primary purpose
was to misrepresent the banks' soundness.

2. Apart from this fundamental error, defendants also misconstrue the
minimum-contacts test for personal jurisdiction by asserting (at 24-26) that a
defendant's in-forum conduct must be causally connected to an *element* of the
plaintiff's claim. That rule would overturn a host of precedents, including those
expressly holding that in-forum contacts need only "relate to" the cause of action.
*See Chew v. Dietrich*, 143 F.3d 24, 29-30 (2d Cir. 1998) (discussing this Court's
sliding-scale approach to the relatedness inquiry). Defendants even acknowledge
(at 24-25) that this Court has "examined a broader range of forum contacts" than
their test would, and that adopting their test thus requires reading recent decisions
to somehow abrogate this Court's precedent. This is all wrong.

First, then-Judge Sotomayor's decision in *Bank Brussels Lambert v. Fiddler
Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002), explicitly holds that

13

"contacts [that] may not have directly given rise to the plaintiff's cause of action, [can] certainly 'relate to' it" for purposes of finding personal jurisdiction—as the Court did there. Defendants finesse this point by saying (at 25) that the defendant's forum contacts there were the "'proximate cause' of the engagement that gave rise to the legal malpractice claims at issue." But *that* is equally true here: At an absolute minimum, defendants' sales of financial products to Schwab in California were the but-for and proximate cause of Schwab's fraud claims respecting those tainted products. That connection is, in fact, *far* closer than the one *Bank Brussels* found sufficient.

*Chloé v. Queen Bee of Beverly Hills*, 616 F.3d 158 (2d Cir. 2010), is equally devastating to defendants. It, too, expressly rejected a similar test for "too narrowly constru[ing] the nexus requirement, which merely requires the cause of action to relate to defendant's minimum contacts with the forum." *Id.* at 167. Accordingly, it found that shipping one knockoff Chloé handbag to New York and maintaining a website for the sale of *other brands'* counterfeit goods was enough to support New York's personal jurisdiction over a general claim of trademark infringement—not a claim limited to the one shipped bag. *Id.* at 165. Indeed, the only in-forum sale in *Chloé* was *to an agent of the plaintiff itself*, *see id.* at 165 & n.3, refuting defendants' suggestion that personal jurisdiction must be evaluated on a transaction-by-transaction basis. *See supra* p.6-8. Here, just as in *Chloé*,

14

defendants' solicitation and sale of their LIBOR-linked products to consumers in California—including billions in sales to Schwab over an extended period—demonstrate the sort of "extensive business activity involving [California]" and "larger business plan purposefully directed at [California] consumers" that suffice for personal jurisdiction in California respecting defendants' whole course of conduct in manipulating LIBOR. *Chloé*, 616 F.3d at 165-66, 171-72.

*Chloé* also disposes of defendants' argument (at 26-27, 36-37) that manipulating LIBOR and then selling manipulated LIBOR-based products into California does not amount to "purposeful availment" of the California market because LIBOR manipulation was aimed at the world-wide market for LIBOR-based products. *Chloé* says the exact opposite: "That [defendants'] business attempted to serve a nationwide market does not diminish any purposeful contacts with [defendants'] New York consumers." 616 F.3d at 158. For this proposition, *Chloé* quotes *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 243 (2d Cir. 1999), which holds that attempting to serve a market "throughout the world[] serves as evidence of [defendants'] attempt to serve the New York market." *Id.* And this Court reaffirmed that rule recently, holding in *EMI Christian Music Group v. MP3tunes*, *LLC* that "attempts to serve a nationwide market constitute evidence of [the defendant's] attempt to serve the [forum state] market." 844 F.3d 79, 98 (2d Cir. 2016) (first alteration in original) (internal quotation marks omitted).

15

Accordingly, defendants cannot escape a claim by parties in markets they deliberately served by invoking the fact that they deliberately served lots of other markets too.

To the extent defendants argue (at 25) that *Chloé* and *Bank Brussels* have somehow been abrogated by the Supreme Court's decision in *Walden v. Fiore*, 134 S. Ct. 1115 (2014), or this Court's decision in *Waldman v. Palestinian Liberation Organization*, 835 F.3d 317 (2d Cir. 2016), that is plainly incorrect. *Walden* involved application of "[w]ell-established principles of personal jurisdiction," 134 S. Ct. at 1126, and did not—as the district court here agreed—create a new legal standard. *See* SPA91 n.61. Nor does either case involve remotely similar facts; neither is even about injuries created by commercial activity. So neither *Walden* nor *Waldman* could have overruled this Court's earlier on-point cases. *See United States v. Punn*, 737 F.3d 1, 11 (2d Cir. 2013) ("[A] panel of this Court has no power to overrule holdings of prior panels.").

In any event, neither case even suggests that a defendant's conduct must arise from an element of the plaintiff's claim for jurisdiction to attach—a reading that would in fact overrule a far greater number of applicable Supreme Court precedents. Case after case instructs that a defendant is subject to personal jurisdiction in a forum if it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State and

16

those products subsequently injure forum consumers." *Burger King*, 471 U.S. at 473 (internal quotation marks omitted); *see also Keeton*, 465 U.S. at 774 ("the general course of conduct in circulating magazines through the state …. would ordinarily satisfy" due process). As *Chloé* and *Bank Brussels* suggest, "suit-related conduct" is forum conduct that relates to a plaintiff's *complaint generally*, not the precise elements of a cause of action. Schwab's allegations easily pass that test.

3. Finally, even were this Court to adopt defendant's proposed causal-nexus test, Schwab's allegations sufficiently establish that nexus. Had the selling defendants not solicited or sold financial instruments to Schwab in California, or had they not made those products available for sale in California, Schwab would not have been damaged by purchasing them (in California). A767-70, A866-75 (¶¶5, 10-12, 268-300). Defendants acknowledge (at 26) that causing damage *is* an element of fraud, and that damage was caused here by the California conduct of selling LIBOR-based products directly to Schwab. That is alone enough for Schwab's claims to proceed.

## C. Defendants' broker-dealer arguments are waived and incorrect.

Defendants next contend that personal jurisdiction cannot attach to any defendants through the wholly-owned subsidiaries that sold LIBOR-based products to Schwab in California. This argument is waived. As defendants admit (at 29) the complaint alleges that defendants controlled these wholly-owned and affiliated

17

broker-dealers and benefitted from their sales. *See* A868 (¶¶274-75); *see also* A774, A776-81, A888 (¶¶23, 38-52, 379-82). Defendants' sole argument is thus that this allegation is "conclusory." But defendants never challenged these allegations below as insufficiently detailed.[1] As before, *see supra* p.4-6, it is too late to raise this now, especially because it unfairly circumvents Schwab's ability to (quite easily) cure any purported pleading deficiency.

Defendants' argument also fails in substance. As they acknowledge (at 28), personal jurisdiction over an entity can attach via the actions of "its agents or distributors." If there is some distinction between an affiliated "broker-dealer" selling a parent's financial products for that parent's profit and a "distributor," defendants don't say what it is. At a minimum, Schwab's allegations of agency and control surely suffice at the pleading stage.

Instead of addressing this issue head on, defendants rely on *Keeton*, 465 U.S. at 781 n.13, for the proposition that it was somehow Schwab's responsibility to "pierce the corporate veil" or the like. But all the cited footnote from *Keeton* says is that a parent's contacts aren't always imputed to the subsidiary. *Keeton*'s point makes sense: The parent is broader in size and purpose, and so its in-forum, suit-related conduct may have nothing to do with the subsidiary. But defendants offer

---

[1] The declarations defendants misleadingly cite (at 29 n.8) say nothing more than that the broker-dealers were separately incorporated entities; they nowhere contest that the broker-dealers acted as agents of their parent banks with respect to selling financial instruments.

18

no authority for the proposition that a wholly-owned subsidiary's in-forum, suit-related conduct cannot create *specific* personal jurisdiction over the parent (as opposed to the *general* jurisdiction at issue in cases like *Daimler*)—especially where, as here, the parent was engaged in suit-related conduct itself and the subsidiary is alleged to have acted on the parent's behalf.

### D. Personal jurisdiction extends to the non-selling defendants through their conspiracy.

As Schwab's opening brief explained (at 33-38), even defendants who did not sell LIBOR-based products to Schwab in California themselves or through affiliated broker-dealers are suable in California as members of the LIBOR-fixing conspiracy. Defendants argue (at 30-35) that conspiracy-based jurisdiction is unavailable based on the narrow view of the conspiracy's purpose they pressed upon the district court below—and which that court recently reaffirmed in *LIBOR VI*. As explained earlier, however, that conception of the conspiracy is untenable after *Gelboim II*. *Supra* p.11-13. And defendants' sole alternative argument—that this Court has somehow abrogated conspiracy jurisdiction—is simply incorrect.

To begin, even the district court did not dispute that conspiracy jurisdiction exists. SPA69-70. It instead rejected Schwab's conspiracy-based theory solely because it held that Schwab failed to adequately allege a conspiracy. *Id.* After *Gelboim II*, the district court still did not challenge the viability of conspiracy jurisdiction, which this Court and numerous others have applied for decades. *See,*

*e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005) (citing *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991)); Opening Br. 34 n.8 (collecting cases). These cases analogize imputation of forum contacts among co-conspirators to the imputation of an agent's contacts to its principal. *See, e.g.*, *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir. 1983).

Defendants argue that conspiracy-based jurisdiction is somehow inconsistent with *Leasco Data Processing Equipment v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), but they fundamentally misread Judge Friendly's decision. *Leasco* did not reject conspiracy jurisdiction outright. Instead, it found that conspiracy jurisdiction can be appropriate, but endorsed the limiting principle that "the mere presence of one conspirator … does not confer personal jurisdiction over another alleged conspirator." *Leasco*, 468 F.2d at 1343. At most, this means only that a conspiracy allegation plus *general* personal jurisdiction (*i.e.*, "mere presence") as to one co-conspirator does not add up to personal jurisdiction over all co-conspirators. Relatedly, it suggests (as other courts have subsequently held) that an unadorned allegation of a conspiracy does not mean *all* the forum contacts of each conspirator can necessarily be imputed to all of the co-conspirators. *E.g.*, *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir. 1992). But, as *Leasco* itself explained, the analysis could be different if the forum contacts of the relevant co-

conspirator were tied to the aims of the conspiracy—particularly if the conspirators were in "frequent communication."  468 F.2d at 1344.

While defendants point out (at 33) that *Leasco* casts this possibility in terms of a senior manager directing the forum contacts of a junior associate in furtherance of their common goals, the Court was merely reciting the most relevant allegations *in that case*, not laying down a test or describing the outer limit of the facts that would suffice in other cases.  Various courts have since recognized that the key requirement, in addition to a well-pleaded conspiracy, is a demonstration that "a co-conspirator's activities in furtherance of the conspiracy had sufficient contacts" with the forum to warrant an exercise of personal jurisdiction over that defendant—and, thereby, its co-conspirators as well.  *See Unspam Techs. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013).

That "in furtherance of" formulation for conspiracy jurisdiction has become critical for the enforcement of key U.S. laws—including by the Department of Justice—against foreign cartels and other wrongdoers engaged in conduct they know will clearly harm U.S. citizens through the actions of co-conspirators in the United States.  As the DOJ has explained, "[s]o long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy," and "[e]very court of appeals to decide this issue has deemed this conspiracy theory of

21

jurisdiction consistent with due process." U.S. Response to Mot. to Dismiss ("Maruyasu Br.") at 15, *United States v. Maruyasu Indus. Co.*, No. 16-CR-64, 2017 WL 228221 (S.D. Ohio filed Sept. 13, 2016) (ECF No. 50). Accordingly, just weeks ago, a district court considering a foreign-cartel prosecution sided with the government and rejected virtually identical arguments to those defendants press here—finding conspiracy-based jurisdiction was appropriate because of the predictable sales of the affected goods by co-conspirators in the United States. *See Maruyasu*, 2017 WL 228221, at *9-11 (S.D. Ohio Jan. 19, 2017). Reaching the opposite holding here would create a circuit conflict and throw settled law at the heart of both private and public enforcement of civil antitrust, fraud, and other consumer protection laws into doubt. Given the immunity it might provide them from U.S. law, it is unsurprising that defendants' *amici*—large groups of international banks, including an overwhelming number of *defendants themselves*—seek this result.

Under the correct, "in furtherance of" test from "every court of appeals," *supra* p.21, this case is easy: Sales of price-fixed LIBOR-based instruments in California were plainly in furtherance of the conspiracy to manipulate LIBOR for the "increased profits" that this Court identified in *Gelboim II*. And in a notable parallel to one factor *Leasco* flagged as relevant, this Court has also already noted "a high number of interfirm communications" among the alleged co-conspirators

in carrying out that scheme. 823 F.3d at 782. It can be reasonably inferred at the pleading stage that defendants knew their LIBOR-manipulation conspiracy would lead to co-conspirators selling manipulated, LIBOR-based financial products into the stream of commerce in California, and so would "reasonably anticipate being haled into court" there. *World-Wide Volkswagen*, 444 U.S. at 297.

Nor does *Walden* assist defendants. Though they repeatedly invoke *Walden*'s unremarkable observation that personal jurisdiction exists where the "defendant *himself* creates [contacts] with the forum State," that language was merely distinguishing contacts created by the defendant from contacts created by *the plaintiff* himself. 134 S. Ct. at 1122. Neither that language, nor anything else in *Walden*, had anything to do with conspiracy-based jurisdiction. Indeed, in the next paragraph, the Court highlighted that entry into a forum state "through an agent" would remain "a relevant contact" (*id.*)—the very theory that allows for imputation of in-forum conduct in furtherance of the conspiracy among co-conspirators.

Finally, as the DOJ has explained, this theory does not impermissibly tie personal jurisdiction to the mere foreseeability of a plaintiff's in-forum injuries. *See* Maruyasu Br. 12-13. To be sure, the kind of proximate-cause foreseeability that suffices for *tort* liability may be insufficient to create personal jurisdiction based on foreseeable in-forum injuries. *Burger King*, 471 U.S. at 474. But joining

a conspiracy goes farther; indeed, it is sufficient to impose *criminal* liability. If co-conspirator acts "in furtherance of" a conspiracy are sufficiently foreseeable to put a defendant *in prison* under the Due Process Clause, they must surely suffice to hale him into court to defend a civil action. *See* Opening Br. 36.

In the end, because the district court ruled against Schwab solely by disclaiming that the conspiracy was as this Court said in *Gelboim II*, its ruling on conspiracy jurisdiction is dead on arrival here. But this Court should further reaffirm the propriety of personal jurisdiction based on co-conspirator acts "in furtherance of" the conspiracy—and in doing so preserve an established and critical basis for public and private enforcement against international conspiracies that target American consumers.

## II. The District Court Erroneously Dismissed Several Claims On The Merits.

The district court repeatedly exceeded its authority under Rule 12(b)(6) by construing the complaint and deciding factual disputes in defendants' favor—the exact opposite of what the Rule dictates. To save the resulting merits rulings, defendants must either misconstrue Schwab's straightforward allegations or reanimate alternative arguments for affirmance even the district court rejected. These arguments fail.

### A. Schwab plausibly alleges common-law fraud for transactions in fixed-rate instruments, as well as securities fraud.

Schwab's core theory regarding both floating-rate and fixed-rate instruments is straightforward: Schwab alleges that it *individually* relied on LIBOR as a sound and accurate figure when determining the relative prices and interest rates at which to purchase both types of instruments. Opening Br. 41-50. And because of defendants' fraudulent manipulation of LIBOR, Schwab received less on those transactions than it otherwise would have. This is a classic basis for a claim of both common-law and securities fraud.

Defendants and the district court nonetheless mischaracterize Schwab's fixed-rate claims as premised on an impermissible fraud-on-the-market theory, because Schwab alleges it was "common" for market participants to evaluate fixed-rate instruments by reference to LIBOR, such that "suppressing LIBOR would *always*, and *obviously*, tend to suppress the rates of return on fixed-rate instruments." Appellees Br. 42 (emphasis by defendants). But as defendants acknowledge (at 42 n.11), Schwab alleged it *actually* and individually (not presumably) relied on LIBOR when deciding to purchase fixed-rate debt. A867 (¶270). The allegations about the "common" practices of parties like Schwab and the expected results do not "plead [Schwab] out of court;" they answer defendants' own argument (at 42-43) that they can be liable only if they had "reason to expect" that plaintiffs like Schwab would rely on LIBOR in making such transactions.

25

They also derail defendants' parade of hypotheticals (at 43), each of which concerns the kind of effect that does not "*always* and *obviously*" follow from manipulating non-benchmark prices wholly unlike LIBOR.

Defendants also contend, in a footnote (at 42 n.11), that Schwab failed to plead individual reliance with particularity. This Court "do[es] not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." *Restrepo*, 986 F.2d at 1463. And in any event, the district court rejected such arguments in upholding actual-reliance allegations for floating-rate-instrument claims, *see* SPA126, and there is no reason to treat these allegations differently.

The same errors plague defendants' arguments regarding Schwab's Exchange Act claims. Defendants first say (at 44-47) that such claims cannot be "in connection with a purchase or sale" of fixed-rate securities because they are, essentially, claims that Schwab "declined to purchase" floating-rate instruments and bought more attractive fixed-rate instruments instead. But that's not Schwab's claim at all. The complaint explains that in actually "undertaking … transactions" in fixed-rate instruments, Schwab accepted materially worse overall returns because it relied on manipulated LIBOR. Opening Br. 46-48, A782 (¶58), A866 (¶270); *see also* A769 (¶11) ("[B]y suppressing LIBOR, Defendants ensured that artificially low interest rates would attach to fixed-rate … notes."). This is a

26

straightforward allegation of fraud "in connection with" the purchase of the fixed-rate instruments themselves. *See Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1070 (2014) (noting Court's historically "broad interpretation" of "in connection with" requirement for Exchange Act claims). Rule 12(b)(6) forbids the district court and defendants from re-characterizing Schwab's conventional claim as "essentially" a more complicated one that favors defendants. *See* Appellees Br. 45; SPA174.

The same goes for defendants' supposedly "generous" division of Schwab's floating-rate instrument claims (at 47-50) into two alternative claims regarding the purchase prices and interest payments on those instruments. Schwab's straightforward allegation is that, because LIBOR was artificially suppressed, the *overall* return to Schwab from purchasing a LIBOR-based bond—which is a function of the purchase price *and* interest rate for any given borrower—was artificially suppressed as well. *See* Opening Br. 49; Goldman Decl. ¶¶9-10; Hastings Decl. ¶¶6-7; Klingman Decl. ¶¶5-9. That allegation must be taken as true for present purposes: The court cannot make the contrary, defendant-friendly assumption that every drop in LIBOR is perfectly offset by a drop in purchase price, such that even manipulated LIBOR fixes have no effect on overall returns. And so Schwab alleges a very simple way in which it was harmed by the "purchase

27

or sale" of floating-rate LIBOR-based instruments at prices and interest rates that, *together*, yielded artificially depressed returns.

Having failed to address the heart of Schwab's Exchange Act claims, defendants turn to two unpersuasive alternative grounds for affirmance.

*First*, they contend (at 50-51) that Schwab's Exchange Act claims do not meet the particularity requirements imposed by Rule 9(b) and the PSLRA. While the district court did not reach this issue, it rejected defendants' similar challenges to state-law fraud claims on equally applicable grounds. "In the context of [allegations of] persistent suppression," it found that "'LIBOR quotes' are sufficiently identifiable to pass muster under Rule 9(b)." SPA154. And for claims that defendants defrauded investors by failing to disclose LIBOR manipulation, it held that while those claims "must be alleged with particularity," there was "no need for plaintiffs to cite specific terms of a contract, because the point of an omission is that information was missing from the contract and from negotiations." SPA143. So too here. And at the very least, if this Court disagrees and affirms dismissal of the Exchange Act claims, Schwab should have the opportunity to amend its complaint. *See supra* p.4-6.

*Second*, defendants try to contest the district court's holding that it could not "determine when plaintiffs were on inquiry notice" of Exchange Act claims arising after April 27, 2008. SPA430. Defendants cannot come close to meeting the

28

threshold for dismissal for these claims, which is far higher than that for Schwab's state-law claims. A reasonable plaintiff has not "discovered" facts sufficient to trigger the two-year statute of limitations in 28 U.S.C. §1658(b)(1) "until he can plead th[ose] fact[s] with sufficient detail and particularity to survive a Rule 12(b)(6) motion to dismiss," including facts affording a "strong inference that the defendant … acted with the relevant knowledge or intent" as required by the PSLRA. *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). The circumstances foreclosing dismissal of Schwab's unjust-enrichment claims, *infra* p.30-32, accordingly apply with even greater force against dismissal of its Exchange Act claims. And the much higher standard likewise prohibits using Schwab's statements regarding the date "before" which it "could not with reasonable diligence have discovered[] facts indicating Defendants were knowingly engaging in misconduct that caused LIBOR to be artificially depressed during the Relevant Period" (A856 (¶232))—which defendants concede (at 52) goes to "inquiry notice"—as a triggering date for the Exchange Act limitations period. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) ("the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period" for Exchange Act claims).

29

## B. Schwab's unjust-enrichment claims are not partially time-barred.

As the opening brief explained (at 58-59), this Court already held in *BPP Illinois, LLC v. Royal Bank of Scotland Group PLC*, 603 F. App'x 57, 59 (2d Cir. 2015), that a statute-of-limitations dismissal based on the same information defendants rely on here was erroneous and premature. Defendants' only response (at 54-57 & n.15) is that *BPP*'s analysis of Pennsylvania's "reasonable diligence" standard is somehow different from the California "contract accrual rule" that (they say) applies. This is incorrect.

As an initial matter, there is no meaningful difference between the standard this Court applied in *BPP* and the one the district court applied below, to the point that the district court in *BPP* relied on Judge Buchwald's analysis in *LIBOR I* (which she reaffirmed in *LIBOR IV*) in reaching its now-vacated decision, *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, No. 13-0638, 2013 WL 6003701, at *6-11 (S.D.N.Y. Nov. 13, 2013), and defendants themselves relied on that now-vacated decision for their inquiry-notice argument below. *See* SDNY Dkt. #11-md-2262, Doc. 756, at 15-16. Pennsylvania's "reasonable diligence" requirement runs the limitations period for a diligent plaintiff from "the point at which a party should have been reasonably aware of his or her injury and its cause," *BPP*, 603 F. App'x at 58 (internal quotation marks omitted), while California's nearly identical discovery rule delays accrual "until a plaintiff knew or should have known of the

30

wrongful conduct at issue" assuming he "establish[es] facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *April Enters., Inc. v. KTTV*, 195 Cal. Rptr. 421, 437 (Ct. App. 1983) (internal quotation marks omitted). Defendants highlight these rules' different names; their content is identical.

Defendants thus fall back (at 55-57) on the self-defeating suggestion that California would apply a different discovery rule that requires no knowledge of wrongdoing based on the "contractual underpinnings" of Schwab's unjust-enrichment theory. But the very case defendants cite, *FDIC v. Dintino*, 84 Cal. Rptr. 3d 38, 49-50 (Ct. App. 2008), held that unjust-enrichment claims grounded in fraud or mistake take the three-year statute of limitations for "an action for relief on the ground of fraud or mistake," Cal. Code Civ. P. §338(d), not the four-year statute of limitations for contract claims. *Dintino*, 84 Cal. Rptr. at 50. The claim accordingly was "not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.* (quoting Cal. Code Civ. P. §338(d)). And, at the very least, defendants must take the bitter with the sweet: They cannot have the more defendant-friendly "ascertainability" rule for contract-based claims while keeping the three-year statute for fraud-based claims—as defendants' own citations once again reveal. *See CMACO Auto. Sys., Inc. v.*

31

*Wanxiang Am. Corp.*, 589 F.3d 235, 248 (6th Cir. 2009) (applying California's *four-year* statute to contract-adjacent unjust-enrichment claims).

## CONCLUSION

The judgment below should be reversed and the case remanded for further proceedings.

Dated: New York, New York
      February 10, 2017

Respectfully Submitted,

/s/ Thomas C. Goldstein
Thomas C. Goldstein
Eric F. Citron
Charles H. Davis
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
tg@goldsteinrussell.com
ecitron@goldsteinrussell.com
cdavis@goldsteinrussell.com

Steven E. Fineman
Michael J. Miarmi
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
sfineman@lchb.com
mmiarmi@lchb.com

Richard M. Heimann
Brendan P. Glackin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

32

275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
rheimann@lchb.com
bglackin@lchb.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certify that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because exclusive of the exempted portions it contains 6,992 words as counted by the word-processing program used to prepare the brief; and

2.  The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2013 in a proportionately spaced typeface: Times New Roman, font size 14.


Dated: February 10, 2017                        /s/ Thomas C. Goldstein
                                                Thomas C. Goldstein

## CERTIFICATE OF SERVICE

I, Thomas C. Goldstein, hereby certify that I served a copy of the foregoing brief on all parties on February 10, 2017 through the Court's CM/ECF system. Counsel for all parties are registered users of that system.

/s/ Thomas C. Goldstein
Thomas C. Goldstein